SILLS CUMMIS & GROSS P.C.
By: Anthony Argiropoulos, Esquire
      Scott B. Murray, Esquire
      Thomas Kane, Esquire
650 College Road East
Princeton, New Jersey 08540
(609) 227-4600 (phone)
(609) 227-4646 (fax)
aargiropoulos@sillscummis.com
smurray@sillscummis.com
tkane@sillscummis.com

*Attorneys for Plaintiff Deborah Heart and Lung Center*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEBORAH HEART AND LUNG CENTER,<br><br>      Plaintiff,<br><br>    v.<br><br>PRESBYTERIAN MEDICAL CENTER OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENN PRESBYTERIAN MEDICAL CENTER, UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, PENN CARDIAC CARE AT CHERRY HILL, CLINICAL HEALTH CARE ASSOCIATES OF NEW JERSEY, P.C., VIRTUA HEALTH, INC., VIRTUA MEMORIAL HOSPITAL BURLINGTON COUNTY, THE CARDIOLOGY GROUP, P.A., and JOHN DOES 1-10,<br><br>      Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Deborah Heart and Lung Center ("Deborah" or "Plaintiff"), located at 200

Trenton Road, Browns Mills, New Jersey 08015, through its counsel, Sills Cummis & Gross

P.C., by way of this Complaint, hereby states the following antitrust claims against the following

Defendants: Presbyterian Medical Center of the University of Pennsylvania Health System d/b/a

Penn Presbyterian Medical Center, 51 N. 39th Street, 1 Wright-Saunders, Philadelphia,

Pennsylvania 19104; University of Pennsylvania Health System, 51 N. 39th Street, 1 Wright-

Saunders, Philadelphia, Pennsylvania 19104; Penn Cardiac Care of Cherry Hill, 1400 E. Route

70, Cherry Hill, New Jersey 08034; Clinical Health Care Associates of New Jersey, P.C., 250

King of Prussia Road, Radnor, Pennsylvania 19087; Virtua Health, Inc., 175 Madison Avenue,

Mount Holly, New Jersey 08060; Virtua Memorial Hospital Burlington County, 175 Madison

Avenue, Mount Holly, New Jersey 08060; and, The Cardiology Group, P.A., 2051 Briggs Road,

Mount Laurel, New Jersey 08054:

## INTRODUCTION

1.      Competition must be fair, ethical, and consistent with the law—especially among

hospitals and when the lives and rights of patients are at stake.

2.      This Complaint arises out of Defendants' ongoing illegal conduct.  Motivated by

the desire to line their own pockets and personal animus, they have conspired to damage

Plaintiff, a non-profit charity hospital, and drive it out of business through unlawful means and at

the expense of consumers, competition, patient rights and safety, and medical ethics.

3.      At a time when the nation's new healthcare act is asking hospitals, physicians and

other medical providers to find new and innovative ways to collaborate and clinically integrate to

form organizations that improve patient care, increase the level of medical services offered and,

most importantly, lower the costs of medical care, the Defendants have done the exact opposite

for patients in Burlington County, New Jersey and its surrounding localities who are in need of

advanced cardiac interventional procedures—namely, conspired to increase the costs such

2

services at the expense of the patient rights and safety.

4.      Since April 2009, Deborah has been prosecuting a state court action against some of the Defendants in this case.  *See Deborah Heart and Lung Center v. Virtua Health, Inc. et al.*, No. BUR-L-1487-09 (the "Burlington County Litigation").  Deborah did not have evidence of the conspiracy in restraint of trade set forth in this Complaint until it received discovery in the Burlington County Litigation in late 2010.  That evidence consists of testimony, contracts, correspondence, and emails—most of which has been wrongly designated as "Confidential" or "Confidential/Attorneys' Eyes Only" pursuant to the Protective Order in that action.  The evidence has been so designated even though much of it touches upon matters of public concern and many of the parties have admitted under oath that the documents do not contain confidential information or otherwise satisfy the requirements for confidentiality set forth in *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 783-84 (3d Cir. 1994).  Deborah has filed a motion to void these designations in the Burlington County Litigation, but that motion has not yet been decided. If and when that motion is granted, this Complaint will be amended to directly quote the documents that prove this conspiracy in restraint of trade in the most vivid terms.

## **THE PARTIES**

5.      Deborah is a New Jersey not-for-profit charity hospital that is licensed by the New Jersey Department of Health and Senior Services and is located at 200 Trenton Road, Browns Mills, New Jersey 08015.

6.      Defendant Presbyterian Medical Center of the University of Pennsylvania Health System d/b/a Penn Presbyterian Medical Center ("Defendant Penn Presbyterian") is a hospital located at 51 N. 39th Street, 1 Wright-Saunders, Philadelphia, Pennsylvania 19104.

7. Defendant University of Pennsylvania Health System ("Defendant Penn Health") is upon information and belief a Pennsylvania corporation with a principal place of business at 51 N. 39th Street, Philadelphia, Pennsylvania 19104.

8. Defendant Penn Cardiac Care of Cherry Hill ("Defendant Penn Cherry Hill") is an agent and/or instrumentality of Defendants Penn Presbyterian and/or Penn Health with a principal place of business at 1400 E. Route 70, Cherry Hill, NJ 08034.

9. Defendant Clinical Health Care Associates of New Jersey, P.C. ("Defendant Clinical Health Care Associates") is a New Jersey professional corporation and an agent and/or instrumentality of Defendants Penn Presbyterian and/or Penn Health with a principal place of business at 250 King of Prussia Road, Radnor, Pennsylvania 19087 and currently rents space at 2051 Briggs Road, Mount Laurel, New Jersey 08054.

10. Defendants Penn Presbyterian, Penn Health, Penn Cherry Hill, and Clinical Health Care Associates will be collectively referred to as the "Penn Defendants."

11. Defendant Virtua Health, Inc. ("Defendant Virtua") is a large, multi-hospital New Jersey healthcare system made up of several New Jersey hospitals with headquarters in Marlton, New Jersey and a principal place of business located at 175 Madison Avenue, Mount Holly, New Jersey 08060.

12. Defendant Virtua Memorial Hospital Burlington County ("Defendant Virtua Memorial"), is a New Jersey hospital, licensed by the New Jersey Department of Health and Senior Services, with a principal place of business located at 175 Madison Avenue, Mount Holly, New Jersey 08060.

13. Defendants Virtua and Virtua Memorial will be collectively referred to as the "Virtua Defendants."

4

14.     Defendant The Cardiology Group, P.A. ("Defendant CGPA") is a New Jersey professional association and cardiology practice with a principal place of business located at 2051 Briggs Road, Mount Laurel, New Jersey 08054.

15.     Defendants John Doe 1 through John Doe 10 are presently unknown natural persons and/or legal persons who knowingly, recklessly, and/or negligently aided, abetted, assisted, and/or conspired with the Penn Defendants, the Virtua Defendants and/or Defendant CGPA in committing the illegal acts set forth in this Complaint.  When Deborah obtains their true identities, this Complaint will be amended to name them specifically.  All John Does are hereby placed on notice of their potential liability, and any future amendments will relate back to this filing.

## JURISDICTION AND VENUE

16.     Deborah herein alleges federal antitrust claims pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1.

17.     Deborah is permitted as a private party to institute this action seeking damages for Sherman Act violations pursuant to 15 U.S.C. § 15 ("[a] person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States . . .  and shall recover threefold the damages by him sustained").

18.     Deborah is also entitled to sue for and obtain injunctive relief under 15 U.S.C. § 26 ("[a] person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws").

19.     This Court has subject matter jurisdiction over Plaintiff's federal antitrust claims

under the Sherman Act and Clayton Act pursuant to 28 U.S.C. §§ 1331 and 1337.

20.     Venue is appropriately established in this Court under 28 U.S.C. § 1391 because: (i) Defendants Penn Cherry Hill, Clinical Health Care Associates, Virtua, Virtua Memorial, and CGPA reside in this district and transact their affairs in this district and/or conduct a substantial amount of business in this district; and, (ii) a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### *Background*

21.     Deborah brings this antitrust suit because of Defendants' anti-competitive actions that harm patients at Defendant Virtua's New Jersey hospitals who are in need of advanced cardiac interventional procedures, as well as patients in need of such procedures in the region served by Deborah and Defendant Virtua.

22.     Forsaking the medical and economic needs of Defendant Virtua's patients, as well as all patients in the region who need advanced cardiac interventional procedures, the Defendants are parties to a conspiracy with the express goal of closing Deborah.

23.     This conspiracy is ongoing and has been effectuated through, *inter alia*, exclusive, interlocking contracts between the Penn Defendants and CGPA and CGPA and the Virtua Defendants.  Pursuant to these contracts, patients needing advanced cardiac interventional procedures at Defendant Virtua's Burlington County hospitals are transported not to Deborah, which is closely located and specializes in providing such procedures, but instead across the Delaware River, often against the patients' express wishes and often by helicopter, to Defendant Penn Presbyterian.  This conspiracy is ongoing and has existed since at least 2007.

6

24.     Because Deborah is one of only three hospitals in the United States that is legally exempt from having to collect insurance co-pays or deductibles from patients, the Defendants are causing patients to incur out-of-pocket expenses for advanced cardiac interventional procedures that the patients would not incur if they were transported to Deborah for these procedures.

25.     In addition, by reducing the usage of Deborah and intending to close it through their conspiracy, Defendants have upon information and belief: (1) raised the cost of such procedures in the region served by Deborah and Defendant Virtua's Burlington County hospitals; and, (2) raised the overall costs of treatment to consumers, insurers, and Medicare and Medicaid because of, *inter alia*, unnecessary transportation and helicopter costs.

26.     For these reasons, the Defendants' actions are not only contrary to New Jersey's Patients' Bill of Rights, which protects the right of patients at New Jersey hospitals regarding transfers, but also violate state and federal antitrust laws.

*The Competitive Landscape Between Deborah and the*
*Virtua Defendants Prior to the Conspiracy in Restraint of Trade*

27.     Deborah is a charity hospital with a unique mission.  Since its founding as a tuberculosis sanitarium and pulmonary center in 1922, Deborah has never directly billed any patient for any service.  This is possible because Deborah is one of only three hospitals in the United States that is exempt from "balance billing" under federal law.  In other words, Deborah is legally exempt from having to collect insurance co-pays or deductibles from patients because of its long history of never having done so.  Deborah is also a "safety net" hospital, meaning that it commits to providing more than 10% of its care to the uninsured.

28.     Today, Deborah is a 139-bed hospital with a full-service ambulatory care center. It offers the latest surgical techniques and non-surgical alternatives for diagnosing and treating

all forms of cardiac, vascular, and pulmonary diseases in adults, as well as congenital and acquired heart defects in adults and children.

29.     Deborah primarily serves patients who reside and work in, or are traveling through, Burlington County, New Jersey and its surrounding localities.

30.     Deborah operates in a portion of the larger Southern New Jersey market that is dominated by Defendant Virtua, a large, multi-hospital healthcare system made up of several Southern New Jersey hospitals.  Although Defendant Virtua is a non-profit, it generates more revenue than many large for-profit corporations.  In 2008, for example, it generated more than $225 million in revenue.

31.     Upon information and belief, Defendant Virtua owns and operates: Defendant Virtua Memorial, a 433-bed, regional medical center in Mount Holly, New Jersey; Virtua Marlton, an 188-bed, regional medical center in Marlton, New Jersey; Virtua Voorhees, a 336-bed regional medical center, in Voorhees, New Jersey; and, Virtua Berlin, a 95-bed, medical-surgical hospital in Berlin, New Jersey.  Upon information and belief, Defendant Virtua will be opening a new Virtua Voorhees in May 2011, which will be a 368-bed hospital and will replace the existing Virtua Voorhees.

32.     Defendant Virtua is estimated to have a market-leading market share of 32.2%—approximately double that of its next largest competitor—in the larger Southern New Jersey market where it competes.  Upon information and belief, Defendant Virtua Memorial's market share in the smaller geographic market in which in competes with Deborah—namely, Burlington County and its surrounding localities—is much higher.  The Virtua Defendants therefore have substantial pricing power in the market at issue in this action.

33.     Since at least 2005, Defendants Virtua and Virtua Memorial have had a

contractual relationship with Defendant CGPA by which Defendant CGPA has been and remains the *exclusive* provider of cardiology services at Defendant Virtua Memorial.

34.    The State of New Jersey regulates what procedures a hospital can perform through a "Certificate of Need" process.  Because of its long history as a nationally-recognized heart and lung specialty hospital, Deborah has long had regulatory approval to perform advanced cardiac interventional procedures that Defendant Virtua is not authorized to perform.

35.    For this reason, Defendant Virtua (through its exclusive provider of cardiology services, Defendant CGPA) historically transferred its most serious cardiac patients to Deborah for advanced procedures, including but not limited to percutaneous coronary intervention ("PCI"), percutaneous transluminal coronary angioplasty ("PTCA"), coronary artery bypass grafting ("CABG"), and other forms of open heart surgery.

36.    The other Southern New Jersey hospitals with a Certificate of Need for such procedures to which Defendant Virtua would transfer a lesser number of patients for such procedures include primarily Cooper Hospital/University Medical Center and Our Lady of Lourdes Medical Center, both in Camden, New Jersey.

*Defendants Agree to Shutdown Deborah*

37.    Upon information and belief, in or about 2007 the Defendants entered into an anti-competitive conspiracy with the express goal of harming Deborah's economic interests in the hopes that it will shutdown entirely.  Defendants subjectively believed that they had the power to cause and/or hasten the closure of Deborah and acted with the express purpose of doing so.

38.    Upon information and belief, the Virtua Defendants and Defendant CGPA have

9

agreed in writing to the shared goal of a complete shutdown of Deborah, or in the alternative, some arrangement by which Defendant Virtua would control Deborah.  Furthermore, Defendants Virtua and CGPA jointly and vehemently have opposed any circumstance that would allow Deborah to remain an independent entity.

39.     The closure or acquisition of Deborah would eliminate from the regional marketplace the only provider of advanced cardiac interventional procedures that does not balance bill or collect insurer co-pays or deductibles from its patients, and allow the Defendants to provide such services unfettered by such price and service competition.

40.     Defendants' anticompetitive conspiracy was initially effectuated by way of an informal pattern and practice, but eventually culminated in Defendant CGPA, the exclusive provider of cardiology services for Defendant Virtua Memorial, negotiating and signing an Affiliation Agreement and other related Agreements with the Penn Defendants.

41.     Upon information and belief, although the Virtua Defendants are not disclosed parties to the Affiliation Agreement or other related Agreements, they participated in the negotiation of those Agreements, had a veto power over all terms in those Agreements, and received direct, unwritten promises from the Penn Defendants regarding the purpose and intended performance of the Agreements' terms that were essential to the bargain.

42.     The Affiliation Agreement and other related Agreements were negotiated by and through Defendants Penn Health and Penn Cherry Hill.  One of the Agreements related to the Affiliation Agreement is a lease by which Defendant Clinical Health Care Associates rents space and personnel in the offices of Defendant CGPA on a weekly basis.  Those lease obligations were a portion of the consideration for the Affiliation Agreement and were essential to the bargain.

43.     Under the terms of the Affiliation Agreement, Defendant Penn Health is the *exclusive* provider of cardiac catheterization services to Defendant CGPA's patients.  In practice, this means that virtually all patients who present at Defendant Virtua Memorial requiring advanced cardiac interventional procedures are transferred to Defendant Penn Presbyterian.

44.     The conspiracy entered into by Defendants in or about 2007, initially through the informal pattern and practice and subsequently through the Affiliation Agreement and other related Agreements, was not designed for any pro-competitive purpose, but instead designed to produce financial and other benefits to each of the Defendants.

45.     As to the Penn Defendants, the conspiracy had the immediate effect of increasing their revenues and market share by creating an influx of new patients that ordinarily they would have little or no opportunity to service.

46.     As to the Virtua and CGPA Defendants, while their current revenues and market share would remain essentially unchanged initially, in the long run if Deborah were to close they would experience a dramatic increase in patient volume.  The numerous patients from Burlington County and its surrounding localities served by Deborah would have to go elsewhere, and the Virtua and CGPA Defendants are the competitors most likely to absorb such patients.

47.     In addition to the influx of new patients, upon information and belief the closure of Deborah would also position Defendant Virtua to obtain a Certificate of Need from State regulators to perform advanced cardiac interventional procedures.

48.     This is because New Jersey State regulations—specifically, N.J.A.C. 8:33— clearly state that "[n]o certificate of need shall be issued unless the action proposed in the application for such certificate is necessary to provide required health care in the area to be served."  Moreover, "[i]n making such determinations" the State takes into consideration "[t]he

availability of facilities which may serve as alternatives or substitutes."

49.    If Deborah were to close its doors, Defendant Virtua would stand a much greater chance of meeting the requirements for obtaining a Certificate of Need for advanced cardiac interventional procedures.  Moreover, the fact that the Virtua Defendants want to perform advanced cardiac interventional procedures is evidenced by the zeal with which they have pursued alternative methods to secure such procedures, including but not limited to their participation in the C-PORT trial.

50.    Upon information and belief, the Virtua Defendants have performed internal analyses of the staffing and facilities that would be required if they gained regulatory approval for advanced cardiac interventional procedures as a result of their participation in the conspiracy to close Deborah.

*Defendant Virtua's Cardiac Transfer Pattern*
*Suddenly and Dramatically Shifts Away from Deborah*

51.    As a direct and proximate result of the anticompetitive conspiracy set forth above, transfers from Defendant Virtua to Deborah dropped precipitously starting in 2007.

52.    Through discovery in the Burlington County Litigation, Deborah subpoenaed records from Exceptional Medical Transportation, the company that is the exclusive provider of ambulance services for cardiac patients being transferred out of Defendant Virtua's hospitals. Those records show that in a period of approximately one year (2007) cardiac transfers from Defendant Virtua shifted from approximately 85% to Deborah to approximately 70% to Defendant Penn Presbyterian.  *See* Figure 1.

**Figure 1.  Quarterly Transfer of Patients to Deborah or Penn Presbyterian from Virtua by Exceptional Medical Transportation (January 2004 through June 2010)**



53.    The Exceptional Medical Transportation data includes ambulance transfers ***only***. It does not include helicopter transfers.  Therefore, the actual percentage of transfers to Defendant Penn Presbyterian is likely much greater than is displayed in the chart above.

54.    Upon information and belief, more than 1,600 patients have been diverted to Defendant Penn Presbyterian in furtherance of Defendants' anti-competitive conspiracy since the conspiracy commenced in 2007.

*Patients Complain About Being*
*Denied Requests to Transfer to Deborah*

55.    As soon as Defendants' anti-competitive conspiracy was formed and put into effect, Deborah began receiving reports from patients that their requests to transfer from Defendant Virtua to Deborah were being denied or obstructed.  Although the exact

circumstances vary somewhat from patient to patient, there are some common themes.

56.    In some instances, patients and their families were simply told outright that they could not transfer to Deborah and/or had to go Defendant Penn Presbyterian.  Although such denials violate the New Jersey Patients' Bill of Rights, N.J.A.C. 8:43G-4.1, the patients were either unaware of their rights or too intimidated to press those rights.  As one patient's family member put it in sworn deposition testimony in the Burlington County Litigation:

> [T]hey were the doctors.  I was nobody.  I learned later that I could have gone to where I wanted to.  But I thought I had to do what they said.

57.    In other instances, Defendant Virtua's physicians and nurses unfairly and unconscionably pressured patients to withdraw their request for a transfer to Deborah while never explicitly stating that the request would be refused.  As one patient put it in sworn deposition testimony in the Burlington County Litigation:

> [I]t just seems like when you talk to them and once you bring up that you're going to, you want to go somewhere else, that their attitude or whatever changes.  That, you know, it is sort of like when you are not buying your Chevy, I'm going to go see a Toyota man now.  It kind of ticks them off.

58.    In still other instances, Defendant Virtua physicians (including those of Defendant CGPA) and nurses made false, defamatory, and malicious statements about Deborah in order to convince patients that they should accept transfer to Defendant Penn Presbyterian.  Although the precise defamatory statements varied from incident to incident, the most common defamatory claims were that Deborah is closing, Deborah does not have enough beds to care for patients, the patients would be turned away at the door, and the quality of Deborah has gone down in recent years.

59.    New Jersey has made clear that medical providers such as the Virtua Defendants and Defendant CGPA owe to each of their hospital patients an affirmative duty to not only treat

these patients with common decency and respect, but honor their rights, especially the right to a

transfer.

      60.     These patient rights include at least the following, which are set forth in the New

Jersey Patients' Bill of Rights, N.J.A.C. 8:43G-4.1:

      a.     To be transferred to another facility only for one of the following reasons, with the reason recorded in the patient's medical record:

         i.     The transferring hospital is unable to provide the type or level of medical care appropriate for the patient's needs. The hospital shall make an immediate effort to notify the patient's primary care physician and the next of kin, and document that the notifications were received; or

         ii.     The transfer is requested by the patient, or by the patient's next of kin or guardian when the patient is mentally incapacitated or incompetent.

      b.     To receive from a physician an explanation of the reasons for transferring the patient to another facility, information about alternatives to the transfer, verification of acceptance from the receiving facility, and assurance that the movement associated with the transfer will not subject the patient to substantial, unnecessary risk of deterioration of his or her medical condition. This explanation of the transfer shall be given in advance to the patient, and/or to the patient's next of kin or guardian except in a life-threatening situation where immediate transfer is necessary.

      c.     To be treated with courtesy, consideration, and respect for the patient's dignity and individuality.

      61.     The Virtua Defendants and Defendant CGPA willfully and knowingly violated

their patients' rights for anti-competitive purposes, including but not limited to seeking to drive

Deborah out of business so that the Penn Defendants could absorb Deborah's market share in the

short term, while positioning Defendant Virtua to obtain a Certificate of Need for advanced

cardiac interventional procedures in the longer term.

      62.     The most direct and immediate anti-competitive consequence of the Defendants'

conspiracy has been the increased out-of-pocket expenses and costs borne by the patients who were transferred to Defendant Penn Presbyterian rather than Deborah for advance cardiac interventional procedures, either without their knowledge that they could be transferred to Deborah or against their express wish to be transferred to Deborah.

63.     Because Deborah does not: (i) collect insurance co-pays or deductibles from patients; or, (ii) balance bill insured patients for costs above what the patient's insurer pays to Deborah; any insured patient that was transferred to Defendant Penn Presbyterian rather than Deborah for advanced cardiac interventional procedures necessarily incurred out-of-pocket expenses for such services that he or she would not have incurred if not for Defendants' illegal conspiracy.

64.     In addition, because Deborah is also a "safety net" hospital, any uninsured patients transferred as a result of the Defendants' illegal conspiracy likely incurred substantial out-of-pocket expenses for such services that they would not have incurred at Deborah.

65.     Further, upon information and belief, third-party insurers and Medicare and Medicaid incurred higher costs for, *inter alia*, helicopter transport and the longer ambulance transportation to Defendant Penn Presbyterian.

66.     The following is a non-exclusive list of patients who have come forward themselves or through family members to date and complained about Defendants' illegal and unconscionable transfer practices:


Patient #1—█████████

67.     On or about September 3, 2007, Patient #1 was taken by ambulance to the Emergency Room at Defendant Virtua Memorial after suffering a massive heart attack and was

treated by Dr. Mark T. Finch of Defendant CGPA.

68.     Dr. Finch advised Patient #1 and his wife that Patient #1 would have to be transferred to Defendant Penn Presbyterian for a cardiac catheterization.

69.     Patient #1 and his wife instead requested that Patient #1 be transferred to Deborah.

70.     Dr. Finch informed Patient #1 and his wife that Deborah's catheterization lab was not open because it was Labor Day.  Dr. Finch further stated that Deborah would not be able to care for Patient #1 because it was short on nurses and was "filthy."

71.     Patient #1's wife tried to argue with Dr. Finch because she was familiar with Deborah and other family members had been treated there in the past.  Dr. Finch responded that they were wasting time and that the helicopter to Defendant Penn Presbyterian was already in the air and on its way to Virtua Memorial.

72.     Patient #1 and his wife gave in to Dr. Finch's pressure.  They were sent to Defendant Penn Presbyterian over their request.

73.     Upon information and belief, Patient #1 incurred out-of-pocket expenses because he was transferred to Defendant Penn Presbyterian rather than Deborah.


Patient #2— █████████

74.     According to deposition testimony provided by Patient #2 in the Burlington County Litigation, on or about October 30, 2007, Patient #2 was taken to the Emergency Room at Defendant Virtua Memorial where he was treated by Dr. Steven M. Lederman, a physician with Defendant CGPA.

75.     Dr. Lederman diagnosed Patient #2 with a 95% blocked artery that required the

implantation of a stent and told Patient #2 that he would be transferred to Defendant Penn Presbyterian for the procedure.

76.     Patient #2 instead requested that he be transferred to Deborah.

77.     Over Patient #2's request, Dr. Lederman told Patient #2 that he would have to be transferred to Defendant Penn Presbyterian.

78.     Patient #2 was in fact transferred to Defendant Penn Presbyterian.

79.     Upon information and belief, Patient #2 incurred out-of-pocket expenses because he was transferred to Defendant Penn Presbyterian rather than Deborah.


Patient #3—███████

80.     According to a sworn Certification from Patient #3's daughter produced in the Burlington County Litigation, on or about November 5, 2007, Patient #3 was treated at Defendant Virtua Memorial by Dr. Charles A. Dennis and Dr. Vincent Spagnuolo, physicians with Defendant CGPA.

81.     Dr. Dennis informed Patient #3 and her family that Patient #3 required a cardiac valve repair, a single cardiac bypass, and surgery for an abdominal aortic aneurysm and announced that Patient #3 would be transferred to Defendant Penn Presbyterian for the procedures.

82.     Patient #3 and her family instead requested that Patient #3 be transferred to Deborah.

83.     Dr. Dennis told Patient #3 and her family that she could not be transferred to Deborah because Deborah could not perform that procedure.  In addition, Dr. Spagnuolo spoke to one member of Patient #3's family and stated that Patient #3 had no choice but to go to

Defendant Penn Presbyterian because Deborah could not handle that level of care.

84.     As a result of the pressure and the statements made by Dr. Dennis and Dr. Spagnuolo, Patient #3 and her family gave in.  Patient #3 was transferred to Defendant Penn Presbyterian over her family's request.

85.     Upon information and belief, Patient #3 incurred out-of-pocket expenses because she was transferred to Defendant Penn Presbyterian rather than Deborah.


Patient #4— █████████████

86.     In or about January 2008, Patient #4 was treated for chest pain by Dr. Charles A. Dennis and Dr. Ralph Russo (both of Defendant CGPA) at Defendant Virtua Memorial.  Patient #4 learned that she needed to be transferred to another hospital because a stent that had previously been implanted by Dr. Dennis had collapsed.

87.     Patient #4 had been treated at Virtua Memorial on many prior occasions and had theretofore always been transferred to Deborah at her request.  She therefore assumed that she would be transferred to Deborah again.  When she got to the ambulance that would be transferring her, however, she learned for the first time that she was going to Defendant Penn Presbyterian.

88.     Patient #4 refused to get in the ambulance and instead returned to the nurses' station to question why she was not going to Deborah.  The nurses' station called Dr. Russo, who informed Patient #4 that Defendant Virtua was no longer affiliated with Deborah and that Defendant Virtua now had a contract with Defendant Penn Presbyterian; therefore, she could not go to Deborah.

89.     As a result of Dr. Dennis' statement, Patient #4 gave in and was sent to Penn

Presbyterian.

90.     While at Defendant Penn Presbyterian, Patient #4's medical bill came to more than $140,000 because she was uninsured.  She has since received numerous phone calls from Defendant Penn Presbyterian attempting to collect the money.

91.     If Patient #4 had been sent to any other New Jersey hospital, her out-of-pocket bill would have been significantly less because of New Jersey's uncompensated care system.  If Patient #4 had been sent to Deborah, she would not have had any out-of-pocket bill whatsoever.

Patient #5—█████████████

92.     In or about February 2008, Patient #5 was treated by Dr. Charles A. Dennis at Defendant Virtua Memorial.

93.     Patient #5 was informed that she would have to be transferred to Defendant Penn Presbyterian should she require any interventional procedures.

94.     Patient #5 instead requested to be transferred to Deborah, but was told that she could not be transferred there.

95.     Patient #5 was in fact transferred to Defendant Penn Presbyterian.

96.     Upon information and belief, Patient #5 incurred out-of-pocket expenses because she was transferred to Defendant Penn Presbyterian rather than Deborah.

Patient #6—█████████████

97.     In or about March 2008, Patient #6 was treated at Defendant Virtua Memorial by Dr. Mark T. Finch.

98.     Patient #6 underwent a cardiac catheterization and thought that a stent would be

implanted during the same procedure.  After the procedure was performed, however, Dr. Finch informed Patient #6 that only a diagnostic catheterization had been performed and he would have to be transferred to Defendant Penn Presbyterian for the stent.

99.    Patient #6 instead requested that he be transferred to Deborah for the procedure.

100.    Dr. Finch told Patient #6 that he could not be transferred to Deborah because Defendant Virtua was no longer associated with Deborah.  Dr. Finch also told Patient #6 that Deborah was closing and that the physicians at Deborah were not very good.

101.    When the ambulance came to transport Patient #6 to Defendant Penn Presbyterian, Patient #6 told the ambulance driver that he wanted to go to Deborah instead.  The ambulance driver told Patient #6 that Patient #6 would have to give him a credit card or $1,000 in cash to be transferred to Deborah.

102.    As a result of the foregoing pressure and statements, Patient #6 gave in and was transferred to Defendant Penn Presbyterian.

103.    Upon information and belief, Patient #6 incurred out-of-pocket expenses because he was transferred to Defendant Penn Presbyterian rather than Deborah.


Patient #7—████████████████

104.    On or about March 6, 2008, Patient #7 was taken to Defendant Virtua Memorial by ambulance where she was treated by Dr. Maria Duca, a physician with Defendant CGPA, and underwent a diagnostic cardiac catheterization.

105.    After the catheterization, Dr. Duca informed Patient #7 and her husband that Patient #7 would be transferred to Defendant Penn Presbyterian for cardiac surgery.

106.    Patient #7 and her husband instead requested that Patient #7 be transferred to

Deborah for the procedure.

107.    Dr. Duca informed Patient #7 and her husband that Patient #7 would have to go to Defendant Penn Presbyterian because Defendant Virtua does not send patients to Deborah any longer because they have a "tertiary" agreement with Defendant Penn Presbyterian.  She also said that Deborah was losing doctors and that many of Deborah's former doctors were now at Defendant Penn Presbyterian.

108.    Because of Dr. Duca's statements, Patient #7 and her husband gave in and Patient #7 was transferred to Defendant Penn Presbyterian for the procedure.

109.    Upon information and belief, Patient #7 incurred out-of-pocket expenses because she was transferred to Defendant Penn Presbyterian rather than Deborah.


Patient #8— █████████

110.    In or about June 2008, Patient #8 suffered a heart attack and was treated at Virtua Memorial by Dr. Anthony Sauerwein, a Defendant CGPA physician.

111.    Dr. Sauerwein told Patient #8 that she would need to undergo a diagnostic cardiac catheterization and if she needed a stent implanted she would be transferred to another hospital the next day.

112.    Patient #8, who is a nurse, requested to be transferred to Deborah or some other hospital where the catheterization and stenting could be performed at the same time.  Dr. Sauerwein told Patient #8 that any hospital that could do a catheterization would implant the stent in a separate procedure the next day.  Dr. Sauerwein further told Patient #8 that if there were an emergency during the catheterization, a helicopter would have her to Defendant Penn Presbyterian within 10 minutes.

113.    Notwithstanding her request for a transfer, Dr. Sauerwein refused to transfer Patient #8 to Deborah and instead moved her to the ICU.

114.    The following morning, Patient #8 insisted on being transferred to Deborah.

115.    Notwithstanding her second request for a transfer, Patient #8 was transferred to Defendant Penn Presbyterian.

116.    Upon information and belief, Patient #8 incurred out-of-pocket expenses because she was transferred to Defendant Penn Presbyterian rather than Deborah.

Patient #9—██████████

117.    In or about November 2008, Patient #9 was treated at Defendant Virtua Memorial by Dr. Charles A. Dennis and Dr. Jay Sussman, both Defendant CGPA physicians.

118.    Dr. Dennis performed a diagnostic cardiac catheterization on Patient #9 and later told Patient #9 and his wife that Patient #9 would have to be transferred to Defendant Penn Presbyterian because of a blockage.

119.    Patient #9 and his wife instead requested that Patient #9 be transferred to Deborah.

120.    Notwithstanding their request for a transfer, Dr. Dennis refused to transfer Patient #9 to Deborah and told Patient #9 and his wife that "it was not good anymore."

121.    Patient #9 was transferred to Defendant Penn Presbyterian.

122.    Upon information and belief, Patient #9 incurred out-of-pocket expenses because he was transferred to Defendant Penn Presbyterian rather than Deborah.

Patient #10—███████████

123.    According to a sworn certification and deposition testimony provided by Patient

#10's wife in the Burlington County Litigation, Patient #10 was admitted to Virtua Memorial for

a serious cardiac condition on four separate occasions; specifically, he was admitted on or about

December 28, 2008, January 1, 2009, February 11, 2010, and March 5, 2010.

124.    During each of Patient #10's first three hospitalizations, the doctors recommended

that he be transferred to Defendant Penn Presbyterian, and during each of those hospitalizations

Patient #11 and his wife repeatedly asked to be transferred to Deborah.  Each time Patient #10

and his wife were told that he "had to" go to Defendant Penn Presbyterian, and each time Patient

#10 was in fact transferred to Defendant Penn Presbyterian.

125.    By the time Patient #10 was hospitalized the fourth time, however, he and his

wife had learned of the existence of the Burlington County Litigation and that New Jersey

patients have a right under state law to transfer to any hospital of their choosing.  For this reason,

Patient #10's wife "stood her ground" in demanding that Patient #10 be transferred to Deborah,

and he was in fact transferred to Deborah.

126.    Upon information and belief, Patient #10 incurred out-of-pocket expenses because

he was transferred to Defendant Penn Presbyterian rather than Deborah on the first three

occasions.


Patient #11—███████████

127.    According to a sworn Certification from Patient #11's sister that has already been

produced in the Burlington County Litigation, in or about February 2009, Patient #11 was

admitted to Virtua Memorial's Emergency Department after suffering a massive heart attack and

was subsequently treated by Dr. Charles A. Dennis, a physician with Defendant CGPA.

128.    With two family members present, Dr. Dennis informed Patient #11 that she needed bypass surgery and would be transferred to Defendant Penn Presbyterian.

129.    Patient #11 and her family instead requested that she be transferred to Deborah for the surgery.

130.    In response, Dr. Dennis stated that Deborah was "getting ready to close," was "too understaffed to treat [Patient #11]," and had "the fourth-lowest score on the report card"—in those words or words to that effect.

131.    Relying on what Dr. Dennis told them, Patient #11 and her family agreed that she should be transferred to Defendant Penn Presbyterian.

132.    But for Dr. Dennis' unlawful and unconscionable efforts to deny Patient #11 her right to transfer to Deborah, Patient #11 would have gone to Deborah.

133.    Upon information and belief, Patient #11 incurred out-of-pocket expenses because she was transferred to Defendant Penn Presbyterian rather than Deborah.


Patient #12—███████████

134.    According to deposition testimony already provided by Patient #12 in the Burlington County Litigation, in or about May 2009, Patient #12 was admitted to Virtua Memorial with chest pains.

135.    On or about May 5, 2009, Patient #12 underwent a diagnostic cardiac catheterization.

136.    After that procedure, Patient #12 was told by the physician that she would be transferred to Defendant Penn Presbyterian for the implantation of cardiac stents.  Patient #12

instead requested to be transferred to Deborah for the procedure.

137.    The physician informed Patient #12, however, that "it was best that [she] go to Philadelphia because that's where the good doctors are" and "Deborah didn't have a bed."

138.    Patient #12 relented and was transferred to Defendant Penn Presbyterian for the interventional procedure.

139.    On or about May 8, 2009, and after Patient #12 had been released by Defendant Penn Presbyterian, Patient #12 again experienced chest pains and was again admitted to Virtua Memorial's Emergency Department.

140.    The physician again told Patient #12 that she would have to be transferred to Defendant Penn Presbyterian.

141.    Patient #12 again requested to be transferred to Deborah instead.

142.    The physician responded that Patient #12 would have to go back to Defendant Penn Presbyterian because the previous work had been done on her there and, again, there were no beds available at Deborah.

143.    Patient #12 insisted on being transferred to Deborah, was "persistent" and said, "give me the papers because I'm signing myself out."

144.    At that point, the physician told Patient #12 that a bed had been found for her at Deborah and arranged for her transfer.

145.    Upon information and belief, Patient #12 incurred out-of-pocket expenses because she was transferred to Defendant Penn Presbyterian rather than Deborah for the initial procedure.

Other Patients

146.    In addition to the patients set forth above who came forward to share with

26

Deborah their complaints about their treatment at the hands of the Virtua Defendants and

Defendant CGPA, which resulted in out-of-pocket expenses being charged by Defendant Penn

Presbyterian to these patients that they would not have incurred from Deborah, upon information

and belief, there are numerous other, similarly situated patients who did not initiate contact with

Deborah about their experiences.

147.    Some of these other patients have made anonymous written complaints to

Defendant CGPA.

148.    Also upon information and belief, in many instances physicians at Defendant

Virtua's hospitals would initiate a transfer to Defendant Penn Presbyterian without having

consulted with the patient.  Then, once the patient learned of their impending transfer and

requested to go to Deborah instead, the physician would use the excuse that "the helicopter is

already in the air" to pressure the patient to go to Defendant Penn Presbyterian.  Medical records

from Defendant Virtua will bear out this fact.

149.    The foregoing events are not isolated.  The sheer number of incidents—as well as

the similarities between them—demonstrate that the Defendants engaged in a pattern and

practice of unlawfully diverting patients from Deborah to Defendant Penn Presbyterian in

furtherance of their anti-competitive conspiracy and in violation of the New Jersey Patients' Bill

of Rights, clearly expressed New Jersey public policy, and established norms of medical ethics.

150.    Upon information and belief, more than 1,600 patients have been diverted to

Defendant Penn Presbyterian in furtherance of Defendants' conspiracy since the conspiracy

commenced in 2007.

151.    Defendants' actions are in violation of federal antitrust laws and have harmed

New Jersey consumers.

*Taking Unnecessary Risks With Heart Attack Patients*

152.   Myocardial infarction, more commonly known as a heart attack, is caused when fatty build-up in the coronary arteries ruptures causing a blockage that interferes with blood flow to the heart muscle.  The longer the flow of blood is blocked, the more likely it is that the heart muscle will be permanently damaged.

153.   Heart attacks, particularly acute STEMIs (ST-segment Elevation Myocardial Infarctions), used to be routinely treated with drugs called thrombolytics, or, in layman's terms, "clot-busters."  The purpose of thrombolytic drugs was to restore blood flow to the heart through intravenous medication.  However, there were several problems with thrombolytics.  First, the drugs are not always effective in restoring blood flow to the heart.  Second, thrombolytics sometimes cause harmful side effects by breaking down "good" clots in organs such as the stomach and brain thereby causing harmful bleeding like an intracerebral hemorrhage.

154.   Today, the preferred treatment for such patients is primary angioplasty.  In that procedure, a catheter is threaded through the artery to the heart, at which point a "balloon" is expanded to physically open the blocked artery.  Because of the problems with thrombolytics and the relative safety of primary angioplasty, today primary angioplasty is the "gold standard" for treatment.

155.   It is generally accepted amongst cardiologists that the goal for "door-to-balloon time" is 90 minutes.  In other words, from the time that a heart attack patient presents at the Emergency Room of Defendant Virtua Memorial until that patient undergoes primary angioplasty at Defendant Penn Presbyterian should be ***no more than 90 minutes***.

156.   When Defendant Virtua Memorial sent its acute STEMI and other heart attack patients to Deborah, transportation time was not a significant issue in meeting the 90-minute goal

for door-to-balloon time.  The two hospitals are approximately 12 miles away, separated by a rural, low-traffic roadway.  By ambulance, the transportation time is just a few minutes.

157.    When Defendant Virtua Memorial changed its transfers to Defendant Penn Presbyterian as part of the anti-competitive conspiracy, however, transportation time became a significant issue for heart attack patients.  Defendant Penn Presbyterian is more than twice the distance from Virtua Memorial compared to Deborah, and necessarily involves transport over some of the most heavily congested roads and bridges in the Delaware Valley and through Center City Philadelphia.

158.    In order to compensate for the far greater commute time, the Virtua Defendants and Defendant CGPA usually send acute STEMI and other heart attack patients to Defendant Penn Presbyterian via helicopter—**when possible**.  But this is at best an imperfect solution. Helicopter transport is far more expensive than ambulance transport and necessarily separates patients from their loved ones.

159.    Moreover, upon information and belief, it appears that the use of helicopters is not enough to compensate for the distance between Virtua Memorial and Defendant Penn Presbyterian and the door-to-balloon time between Virtua Memorial and Defendant Penn Presbyterian far, far exceeds the recommended 90 minutes.

160.    But the biggest problem with relying on helicopter transport is that helicopters must be grounded in less-than-perfect weather.  Yet, upon information and belief, even in bad weather conditions when helicopters are not flying, Defendants Virtua and CGPA still send acute STEMI and other heart attack patients to Defendant Penn Presbyterian rather than Deborah— despite the far, far longer transport time and the necessary impact it has on the 90-minute goal for door-to-balloon time.  Even at the height of rush hour traffic, patients are apparently sent to

Defendant Penn Presbyterian instead of Deborah.  In so doing, the Virtua Defendants, Defendant

CGPA, and the Penn Defendants unnecessarily endanger these patients and substantially lower

their patients' chances of a successful recovery, all the while increasing the out-of-pocket

expenses to be incurred by these patients.

161.    Thus, this is just one reason why there is no pro-competitive benefit to the

Defendants' actions in diverting patients from Deborah, or any other closer New Jersey hospital,

to Defendant Penn Presbyterian for advanced cardiac interventional procedures.

*Defendants' Actions Violate The Sherman Act*

162.    The Penn Defendants, Virtua Defendants, and Defendant CGPA had, and

continue to have, a conscious commitment and an agreement that operates to restrain competition

for the provision of advanced cardiac interventional procedures in the local New Jersey

geographic market served by Deborah and Defendant Virtua's Burlington County hospitals.

163.    Through Defendant CGPA serving as the exclusive provider of cardiology

services at Defendant Virtua Memorial, and Defendant CGPA's agreement to use Defendant

Penn Presbyterian as its exclusive provider for cardiac catheterization and other advanced

cardiac interventional services, the Defendants have diverted, and continue to divert, patients to

Defendant Penn Presbyterian, rather than Deborah (or other closer Southern New Jersey

hospitals) for such services—often even when a patient expressly requests a transfer to Deborah.

164.    The Defendants know that the effect of transferring patients to Defendant Penn

Presbyterian rather than Deborah means that patients will incur out-of-pocket expenses related to

insurance co-pays and deductibles and balance billing, which patients who are insured would not

incur at Deborah.

165.    Moreover, for uninsured patients, the Defendants know that such patients will incur significant out-of-pocket expenses that they would not incur at Deborah, which is committed to serving the uninsured, or even another Southern New Jersey hospital that offers advanced cardiac interventional procedures pursuant to New Jersey's uncompensated care laws.

166.    There is no pro-competitive benefit to transfers to Defendant Penn Presbyterian rather than Deborah for advanced cardiac interventional procedures, or even the other Southern New Jersey hospitals offering such services.

167.    Moreover, representatives and agents of Defendants Virtua and CGPA have used misleading, untrue and defamatory statements regarding Deborah to convince patients to transfer to Defendant Penn Presbyterian over their express wishes, or have simply failed to apprise patients of their right under New Jersey law to be transferred to the hospital of their choice that offers the necessary advanced cardiac interventional procedures.

168.    The relevant product market affected by the anticompetitive conduct alleged herein is the provision of advanced cardiac interventional procedures.

169.    While Defendant Virtua is not a current competitor with Deborah for all such services, Defendants' conspiracy has made Defendant Penn Presbyterian a current "preferred" competitor to Deborah, and the ultimate goal of the conspiracy is to have Defendant Virtua replace Deborah as the provider of such services in the region served by Defendant Virtua's Burlington County hospitals and Deborah.

170.    The relevant geographic market for the advanced cardiac interventional procedures is the local region served by Deborah and Defendant Virtua's Burlington County hospitals.  Patients normally seek to obtain medical services, especially emergency services as those relevant here, where they work and live, or are traveling through.  Thus, the local New

31

Jersey region served by Deborah and Defendant Virtua's Burlington County hospitals—namely, Burlington County and its surrounding localities—represents the relevant geographic area for the relevant product market.

171.    In this relevant product market and geographic region, Defendants' conspiracy has raised the cost of advanced cardiac interventional procedures for patients.

172.    To the extent that any patient at one of Defendant Virtua's hospitals was transferred to Defendant Penn Presbyterian rather than Deborah pursuant to the exclusive agreement between Defendant CGPA and Penn Presbyterian, as explained herein, such patients necessarily incurred out-of-pocket expenses at Defendant Penn Presbyterian that the patient would not have incurred at Deborah, regardless of whether such patient was insured or uninsured.

173.    Moreover, upon information and belief, third party insurers and Medicare and Medicaid likely incur higher costs for, *inter alia*, helicopter transport and the longer ambulance transportation to Defendant Penn Presbyterian than the cost of patient transport to Deborah.

174.    In addition, it is likely that given the reduction in the number of patients served by Deborah for advanced cardiac interventional procedures, the overall cost of such services to consumers in the relevant geographic region is higher, or has not been reduced, because of the reduced competition from Deborah to the other Southern New Jersey hospitals offering such services, as a result of Defendants' conspiracy.

175.    These current anti-competitive effects are just the prelude to the Defendants' ultimate anti-competitive goal for their conspiracy, forcing the closure of Deborah and allowing Defendant Virtua to obtain the coveted Certificate of Need for advanced cardiac interventional procedures in the relevant geographic market, which would eliminate the lowest price provider in

the marketplace, Deborah.

## COUNT I—VIOLATION OF SHERMAN ACT SECTION 1

176.    Plaintiff incorporates each of the foregoing Paragraphs herein as if set forth in full.

177.    Through the means alleged above, the Penn Defendants, Virtua Defendants, and Defendant CGPA conspired and agreed to restrain trade by agreeing to change Defendant Virtua's tertiary care referral pattern from Deborah (or other Southern New Jersey hospitals) to Defendant Penn Presbyterian for advanced cardiac interventional procedures, often regardless of the express wishes of such patients, even though such change results in higher out-of-pocket expenses to patients and provides no medical or pro-competitive benefit and is in violation of New Jersey law and public policy as expressed in the Patients' Bill of Rights.

178.    Under the Rule of Reason, the Penn Defendants, Virtua Defendants, and Defendant CGPA continue to violate § 1 of the Sherman Act, and have violated it since at least 2007, for which Plaintiff is entitled to relief, pursuant to Sections 4 and 16 of the Clayton Act, including injunctive and monetary relief, including treble damages, attorney's fees, court costs and other relief deemed appropriate by the Court.

179.    Patients in the relevant geographic market defined herein have been harmed by being forced to incur out-of-pocket expenses for advanced cardiac interventional procedures performed at Defendant Penn Presbyterian that such patients would not have incurred at Deborah, and/or patients in the relevant geographic market have been harmed by experiencing higher prices for such services at other New Jersey hospitals in the relevant geographic market because of the reduced significance of Deborah due to the Defendants' anti-competitive

conspiracy.

180.   As a result of the anti-competitive actions alleged above, the Penn Defendants, Virtua Defendants, and Defendant CGPA have caused Deborah harm in the form of lost patients and reduced revenues and are entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

181.   The Defendants' aforementioned conspiracy in restraint of trade in violation of § 1 of the Sherman Act entitles Deborah to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

182.   The Defendants' aforementioned conspiracy in restraint of trade has substantially affected interstate commerce by, *inter alia,* diverting more than 1,600 patients from Southern New Jersey to Philadelphia, Pennsylvania since the conspiracy commenced in 2007.

**WHEREFORE,** Deborah prays that the Court enter judgment in its favor and against all Defendants, jointly and severally, as follows:

(a)   For preliminary and permanent injunctive relief enjoining Defendants from continuing their agreement to: (i) exclusively transfer patients of the Virtua Defendants and Defendant CGPA to Defendant Penn Presbyterian for advanced cardiac interventional procedures; (ii) disregard patient requests to transfer to Deborah for such procedures; and, (iii) misinform or otherwise coerce patients of the Virtua Defendants and Defendant CGPA to rescind their requests for a transfer to Deborah for such procedures.

(b)   For compensatory damages, to be trebled;

(c)   For pre-judgment and post-judgment interest;

(d)   For attorney's fees and costs of suit; and,

(e)   Such other and further relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury, pursuant to Fed. R. Civ. P. 38(b), on all issues so triable.

SILLS CUMMIS & GROSS P.C.
*Attorneys for Plaintiff*
*Deborah Heart and Lung Center*

By: /s/ ANTHONY ARGIROPOULOS

Dated: March 7, 2011          ANTHONY ARGIROPOULOS
SCOTT B. MURRAY
THOMAS KANE