## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEBORAH HEART AND LUNG CENTER,<br><br>Plaintiff,<br><br>v.<br><br>PRESBYTERIAN MEDICAL CENTER OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENN PRESBYTERIAN MEDICAL CENTER, UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, PENN CARDIAC CARE AT CHERRY HILL, CLINICAL HEALTH CARE ASSOCIATES OF NEW JERSEY, P.C., VIRTUA HEALTH, INC., VIRTUA MEMORIAL HOSPITAL BURLINGTON COUNTY, THE CARDIOLOGY GROUP, P.A., and JOHN DOES 1-10,<br><br>Defendants. | Civil Action No. 1:11-CV-01290-RMB-KMW<br><br><br><br>Document Electronically Filed<br><br>MOTION DAY:  JULY 5, 2011 |

## REPLY BRIEF OF THE PENN DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

Robert A. White (RW-6063)
rwhite@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ  08540-6241
Telephone:  (609) 919-6600
Facsimile:   (609) 919-6701

Jay H. Calvert, Jr. (*pro hac vice*)
jcalvert@morganlewis.com
Mark P. Edwards (*pro hac vice*)
medwards@morganlewis.com
R. Brendan Fee (RF-4838)
bfee@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:  (215) 963-5000
Facsimile:   (215) 963-5001

*Counsel for the Penn Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.     INTRODUCTION ................................................................................. 1

II.    LEGAL ARGUMENT ........................................................................... 2

    A.    Deborah Concedes That The Penn Defendants Did Not Engage In Actionable Anticompetitive Conduct .................................................... 2

    B.    Deborah's Claim That It Has Alleged Antitrust Injury Is Incorrect ..................... 4

        1.    Deborah's Alleged Harm Could Only Be Attributed To Increased Competition From PPMC, Which Is Not Antitrust Injury ........................ 4

        2.    Deborah's Allegation That Patients Are Paying Higher Prices At PPMC Is Not Sufficient To Establish Actionable Antitrust Injury ........... 6

    C.    Deborah's Exclusion Of The Philadelphia Area From The Relevant Geographic Market For Emergent/Primary Angioplasty Is Unsupportable ......... 8

    D.    Deborah Effectively Concedes That No Defendant Has Market Power In The Alleged Markets For Non-Emergent Cardiac Care ..................................... 10

    E.    Deborah's Theory Of Specific Intent As To The Penn Defendants Is Incoherent ........................................................................................ 11

III.    CONCLUSION ........................................................................... 12

## <u>TABLE OF AUTHORITIES</u>

<div align="right"><u>Page(s)</u></div>

*AD/SAT v. Associated Press,*
181 F.3d 216 (2d Cir. 1999)................................................................10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)..........................................................................6

*Chicago Prof'l. Sports Ltd. P'ship v. Nat'l Basketball Ass'n.,*
961 F.2d 667 (7th Cir. 1992)...............................................................7

*Coast to Coast Entertainment, LLC v. Coastal Amusements,*
No. 05-3977, 2005 U.S. Dist. LEXIS 26849 (D. N.J. Nov. 7, 2005) ......................9

*Consul, Ltd. v. Transco Energy Co.,*
805 F.2d 490 (4th Cir. 1986) ..............................................................9

*Granite Partners, L.P. v. Bear Stearns & Co.,*
58 F. Supp. 2d 228 (S.D.N.Y. 1999).......................................................4

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,*
602 F.3d 237 (3d Cir. 2010)...........................................................11, 12

*In re Set Top Cable Television Box Antitrust Litig.,*
No. 08-1995, 2011 U.S. Dist. LEXIS 39001 (S.D.N.Y. April 8, 2011) ..................10

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,*
909 F.2d 1524 (3d Cir. 1990)..............................................................7

*Juster Assoc. v. Rutland,*
901 F.2d 266 (2d Cir. 1990)............................................................5, 6

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984).......................................................................4

*Precision Surgical, Inc. v. Tyco Int'l, Ltd.,*
111 F. Supp. 2d 586 (E.D. Pa. 2000) ......................................................7

*Rome Ambulatory Surgical Ctr. LLC v. Rome Memorial Hosp., Inc.,*
349 F. Supp. 2d 389 (N.D.N.Y. 2004) ......................................................5

*Santana Prods, Inc. v. Bobrick Washroom Equip., Inc.,*
401 F.3d 123 (3d Cir. 2005)...............................................................3

*Singh v. Mem'l Med. Ctr.,*
536 F. Supp. 2d 1244 (D. N.M. 2008) ......................................................5

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)..................................................................................................9

*Trans World Technologies, Inc. v. Raytheon Co.*,
   06-5012, 2007 U.S. Dist. LEXIS 82118 (D. N.J. Nov. 1, 2007) ...............................4

*Tri-Gen, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*,
   433 F.3d 1024 (7th Cir. 2006) ...................................................................................5

*West Penn Allegheny Health Sys., Inc. v. Highmark, Inc.*,
   627 F.3d 85 (3d Cir. 2010)..........................................................................................3

I.     **INTRODUCTION**

Plaintiff Deborah's[1] opposition brief cannot conceal that its antitrust claims are based on the false premises that (1) the Sherman Act can be used to stifle the unwanted competition that Deborah is facing from PPMC for advanced cardiac procedures, and (2) competition that Deborah thinks is just too much is properly addressed by the antitrust laws, even though Deborah's view, if adopted, would effectively federalize state tort law.  Deborah's claims in this case, which are based solely on alleged "bullying and lying to heart attack patients" (Opp., p. 2), are missing indispensable elements that set federal antitrust claims apart from state tort claims, and, for all its rhetoric, Deborah's opposition brief fails to confront those basic defects.

In its opposition brief, Deborah has conceded numerous crucial points that support the Penn Defendants' motion to dismiss.  Those admissions, many of which appear in footnotes to the opposition brief, make it apparent that Deborah has pleaded itself out of court as to the Penn Defendants.  Deborah admits that:

- the exclusive contract between the Penn Defendants and CGPA is not a violation of the antitrust laws, and is not a basis for Deborah's claims in this lawsuit (Opp., p. 36, n. 6);

- the Penn Defendants did not participate in any of the alleged coercion, bullying, and false statements that, Deborah also concedes, constitute the overt acts in furtherance of the alleged conspiracy (Opp., p. 27);

- it has not, and cannot consistent with Rule 11, allege that the Penn Defendants wanted to run Deborah out of business (Opp., p. 26);

- it still treats on average 30% of the cardiology patients that present at Virtua Memorial, notwithstanding the alleged conspiracy (Opp., p. 11);

- there is "stiff competition" for cardiac services in the Philadelphia area, which, by the logic of Deborah's complaint, is part of the relevant geographic markets in

_____

[1]  For consistency, the parties shall be referred to throughout this Reply by the abbreviated names used in the Penn Defendants' Brief in Support of their Motion to Dismiss.

which its antitrust claims must be assessed for their actual impact on competition (Opp., p. 7); and

- neither its ability to avoid having to charge deductibles and co-pays to cardiac patients, nor, conversely, the requirement that all other competing hospitals, including PPMC, charge those fees, is a consequence of some superior competitiveness of Deborah or any alleged anticompetitive conduct by the Penn Defendants, and instead, those phenomena are purely a regulatory anomaly. (Opp., p. 37, n. 8).

Furthermore, Deborah does not dispute the arguments presented by the Penn Defendants that: (1) Deborah has not plausibly alleged that the Penn Defendants specifically intended to bestow a monopoly on Virtua; (2) Deborah's claims seek to pervert the antitrust laws to compel a judicial outcome that would require the Defendants to "cooperate and clinically integrate" with Deborah; (3) the alleged conspiracy has not caused any reduction in the number of cardiac procedures being performed; and (4) Deborah's claims are not based on any actual or potential foreclosure from the markets for advanced cardiac procedures, and instead, are premised on a new referral pattern that has left Deborah without the near-total stranglehold it once held on cardiac patients who present to Virtua Memorial's emergency room.  Hence, Deborah has effectively conceded those arguments and the deficiencies they underscore in the FAC.

## II.   LEGAL ARGUMENT

### A.   Deborah Concedes That The Penn Defendants Did Not Engage In Actionable Anticompetitive Conduct.

The only asserted link between the Penn Defendants and the alleged conspiracy forming the foundation of this case is the alleged exclusive agreement between the Penn Defendants and CGPA.  However, in its opposition brief, Deborah has abandoned its allegation that the Penn Defendants' exclusive agreement with CGPA provides a basis for its antitrust claims. (Opp. p. 36 n. 6).  Deborah admits that the exclusive agreement with CGPA does not "represent the antitrust violation."  *Id.*

2

Deborah had to abandon the contrary position because, as the Penn Defendants noted in their opening brief, Deborah cannot establish the degree of market foreclosure necessary to sustain an antitrust claim based on that agreement.  (Dkt. 26-1, pp. 10-11).  Moreover, as the Penn Defendants also noted, Deborah could not very well claim that the agreement was an antitrust violation when it previously had a *de facto* exclusive relationship with CGPA. *Id.*, p. 10.

Deborah now admits that its theory of antitrust liability is wholly premised on supposed "defamatory and malicious" statements made to cardiology patients by defendants other than the Penn Defendants.  Deborah acknowledges that the Penn Defendants made none of those statements, which, Deborah says, constitute the only "overt acts" in furtherance of the alleged conspiracy to run Deborah out of business. (Opp., pp. 2, 27).[2]

The mere fact of the Penn Defendants' exclusive contract with one of two parties who are alleged to have defamed Deborah and supposedly want it out of business simply cannot be a proper basis for antitrust liability, when Deborah admits that the contract itself is not an antitrust violation, and when there are no allegations that the Penn Defendants participated in any of the conduct Deborah says was wrongful.  Such an outcome would be inconsistent with controlling law and would result in an upside-down world in which any party in privity with an alleged

---

[2]  In any case, Deborah's allegations that CGPA and the Virtua Defendants made false statements to patients cannot form the basis for an antitrust claim because "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." *Santana Prods, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132 (3d Cir. 2005).  The very authority on which Deborah relies – *West Penn Allegheny Health Sys., Inc. v. Highmark, Inc.*, 627 F.3d 85 (3d Cir. 2010) – acknowledges that general principle, noting that "the making of false statements about a rival, without more, rarely interferes with competition enough to violate the antitrust laws," yet Deborah erroneously contends that *West Penn* lends support to its position. *Id.* at 109, n. 14.  At most, *West Penn* suggests that in **rare circumstances** defamation may give rise to federal antitrust claims when "combined with other anticompetitive acts." *Id.* Here, unlike in *West Penn*, the alleged "overt acts" giving rise to Deborah's claims are confined to the alleged defamation of its services by CGPA and the Virtua Defendants. (Opp., p. 2).

violator could be held liable for treble damages, despite the absence of a "conscious commitment

to a common scheme." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

### B.   Deborah's Claim That It Has Alleged Antitrust Injury Is Incorrect.

Deborah contends that the existence of antitrust injury cannot be resolved on a motion to

dismiss (Opp., p. 31) but, as this Court noted in *Trans World Technologies, Inc. v. Raytheon*

*Co.*, 06-5012, 2007 U.S. Dist. LEXIS 82118 (D. N.J. Nov. 1, 2007), it is perfectly proper to

dismiss a complaint when, as here, the plaintiff has failed to plausibly allege harm to

competition.  *Id.* at *15-16.[3]  Recognizing that such a categorical prohibition on resolving the

issue of antitrust injury at the pleadings stage has been rejected by this Court, Deborah next

argues that it has adequately alleged harm to the competitive process, and not just harm to itself.

Yet, those arguments once again rest on a basic misunderstanding of the antitrust laws and the

distinct rights they are designed to vindicate.

#### 1.   Deborah's Alleged Harm Could Only Be Attributed To Increased Competition From PPMC, Which Is *Not* Antitrust Injury.

Deborah attempts to sidestep the fundamental problem with its theory of antitrust harm,

*i.e.,* that it is predicated on **increased** competition from PPMC, by arguing that PPMC has "long

attempted to compete in the Burlington County market" (Opp., p. 34), as if that somehow alters

the analysis.  It does not.  Enhanced competition – which the antitrust laws are designed to foster,

---

[3]  Deborah's opposition brief mistakenly conflates the analysis of antitrust injury with the analysis of anticompetitive effects.  Each is a separate and distinct element of any rule of reason antitrust claim – they are not alternatives.  Deborah must establish **both**. The analysis of anticompetitive effects goes to whether the alleged restraint is unreasonable, while the antitrust injury analysis "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place."  *Granite Partners, L.P. v. Bear Stearns & Co.*, 58 F. Supp. 2d 228, 240 (S.D.N.Y. 1999) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).  Thus, even if Deborah had sufficiently alleged that Defendants' conduct had anticompetitive effects within a properly-defined relevant market, which it has not, it still would need to show that it suffered antitrust injury in order for its claims to survive.  Here, all Deborah can point to is harm to itself as the result of increased competition.

not curtail – comes in many varieties, and is not limited to new market entry.  Competition can be increased, for example, when an existing rival, such as PPMC here, becomes more robust. The basic premise of Deborah's theory of harm in this case is that PPMC, enhanced by its supposedly exclusive agreement with CGPA, was able to bring about a "change [in the]… referral pattern" that worked to Deborah's detriment.  (FAC, ¶ 213).  It is well-settled that such "reshuffling," *Singh v. Mem'l Med. Ctr.*, 536 F. Supp. 2d 1244, 1256 (D. N.M. 2008), and "transfer[s] of business" from one competitor to another, *Tri-Gen, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006), while perhaps harmful to one competitor, represent an increase in competition, which is not antitrust injury.

Deborah offers one case – *Rome Ambulatory Surgical Ctr. LLC v. Rome Memorial Hosp., Inc.*, 349 F. Supp. 2d 389 (N.D.N.Y. 2004) – as a counterweight to the long line of precedent holding that shifts in business from one competitor to another do not constitute antitrust injury. But *Rome Ambulatory* actually undermines Deborah's position.  In *Rome Ambulatory*, the court observed that the burden of establishing antitrust injury only "is met if the alleged conduct would prevent [the plaintiff] from competing in the…market, not just keep [the plaintiff] from winning in it."  *Id.* at 405.  Deborah's lament in this case is not that it has been foreclosed from competing in the alleged relevant markets, and, in fact, Deborah admits that it still treats on average 30% of the cardiology patients from Virtua Memorial.  (Opp., p. 11). Instead, Deborah's complaint is that it has, in recent years, lost its former stranglehold on those cardiac patients, as a result of (a) Deborah's falling-out with CGPA, and (b) CGPA's transferring a greater percentage of those patients to PPMC.  (Opp., pp. 5-6, 10-11).  That simply is not actionable antitrust injury; rather, it is the proper functioning of a competitive market. *See Juster Assoc. v. Rutland*, 901 F.2d 266, 269 (2d Cir. 1990) ("[T]he mere fact of increased competition and reduced profits resulting from

an agreement between other parties does not constitute an antitrust injury to a plaintiff").

> **2.    Deborah's Allegation That Patients Are Paying Higher Prices At PPMC Is Not Sufficient To Establish Actionable Antitrust Injury.**

Deborah asserts that it need not have alleged any reduction in output to establish antitrust injury because, it says, it has alleged that Defendants' conduct has caused patients to pay higher prices for supposedly lower-quality cardiac services at PPMC. (Opp., p. 37).[4]  That argument is wrong as a matter of both law and basic economics.

First, Deborah does not allege that any of the Defendants' conduct has lead to higher prices.  To the contrary, Deborah concedes that the differences between the prices it charges and the prices charged to cardiac patients by PPMC, as well as by Cooper Hospital and Our Lady of Lourdes Hospital, are attributable to a regulatory anomaly allowing it to waive co-pays and deductibles, which Deborah and ***no other competing hospital*** enjoys. (Opp., p. 37, n. 8).[5]  Hence, the supposed fact that patients pay lower prices at Deborah than at PPMC ***is not an outcome of competition***, and thus, that price difference is not "injury of the type the antitrust laws were intended to prevent," and cannot amount to actionable antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Second, common sense and experience teach that rivals in a competitive market invariably charge different prices, and one price is necessarily going to be higher than the other.

---

[4]  The Penn Defendants dispute Deborah's assertion that cardiac patients are receiving lower quality care at PPMC.  If anything, patient care has been improved because patients now have access to the resources of a world-class, Ivy League teaching hospital.

[5]  If the regulatory exemption that Deborah enjoys can be the basis for a finding of antitrust injury, then Deborah would suffer antitrust injury each time a patient is transferred to Cooper Hospital or Our Lady of Lourdes Hospital, instead of Deborah, because those hospitals, like PPMC, are required by federal law to charge patients co-pays and deductibles.  Deborah alleges, however, that such transfers would not contravene the antitrust laws. (FAC, ¶¶ 187, 213).  The only possible way to reconcile those seemingly contradictory claims by Deborah is to conclude that co-pays and deductibles paid by patients at PPMC do not give rise to competitive injury for which the antitrust laws should provide a remedy.

The fact that one rival may charge higher prices than the other does not, however, signal that its prices are "supra-competitive," as Deborah apparently contends. (*e.g.*, Opp., p. 35).[6]  Courts have recognized repeatedly that higher prices are not themselves a concern of the antitrust laws; rather, only when they stem from a reduction in output are higher prices of any antitrust significance.  *See Chicago Prof'l. Sports Ltd. P'ship v. Nat'l Basketball Ass'n.*, 961 F.2d 667, 670 (7th Cir. 1992).  Deborah does not assert that fewer cardiac procedures are being performed as a result of Defendants' alleged conduct, which is fatal to its antitrust claims.

Finally, putting aside all of its other problems, the allegation that cardiac patients have paid higher prices for lower quality services at PPMC is simply not antitrust injury *to Deborah*, even if it could constitute antitrust injury to those patients.  *See Precision Surgical, Inc. v. Tyco Int'l, Ltd.*, 111 F. Supp. 2d 586, 590 (E.D. Pa. 2000) (increased prices paid by consumers as a result of defendants' alleged anticompetitive conduct was not antitrust injury to a competitor-plaintiff because "increase in price or diminution of quality…would be injury to those consumers, not an antitrust injury to plaintiffs' business or property").  To establish antitrust injury, and to recover damages under Section 4 of the Clayton Act, a claimant must allege both harm to competition, and a connection between that competitive harm and its alleged injury. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531-32 (3d Cir. 1990).  The alleged harm to Deborah's business or property that forms the basis of its claim, *i.e.*, "reduced revenues" (FAC, ¶ 216) occurred at the moment the patients were transferred to PPMC instead of Deborah, and would have occurred independent of whether patients pay higher prices or receive sub-standard

---

[6]  Deborah's assertion that the prices paid by patients at PPMC are "supra-competitive" is, in any event, nonsensical. Deborah has conceded that PPMC faces "stiff competition" for cardiac patients from surrounding hospitals, and thus, its prices are not supra-competitive, but *competitive*, by definition.  (Opp., p. 7).

treatment at PPMC.  There is thus no connection between Deborah's alleged injury and the competitive harm upon which Deborah says its claims now rest.

### C.   Deborah's Exclusion Of The Philadelphia Area From The Relevant Geographic Market For Emergent/Primary Angioplasty Is Unsupportable.

The Penn Defendants explained in their opening brief that their motion to dismiss should be granted for the additional and alternative reason that Deborah had failed to allege a proper geographic market for emergent/primary angioplasty. (Dkt. 26-1, pp. 20-23).  Deborah argues, however, that it has properly limited its geographic market for emergent/primary angioplasty to exclude Philadelphia based on a supposed "90 minute door-to-balloon window," which it claims is optimal for such procedures.  (Opp., p. 39).  Deborah has established the "90 minute door-to-balloon window" as setting the outer boundaries of the relevant geographic market in an effort to exclude PPMC and all other Philadelphia cardiac hospitals from that market, and thus, create an illusion of market power.  But because of PPMC's proximity to Virtua Memorial, and because the means of transportation used to transfer patients from Virtua Memorial include helicopters, geography is not the determinative factor in whether a patient can be catheterized within 90 minutes.[7]  Deborah's argument is thus a *non-sequitur* and again proves too much.

If, for example, there is insufficient available medical staff or a shortage of operating rooms at, say, Cooper Hospital,[8] patients may not be treated within the 90 minute window, even though Deborah says Cooper is in the relevant geographic market it alleges.  Conversely, if patients can be transported say, by helicopter, to a hospital in Philadelphia with a large staff or

---

[7]  In fact, Deborah concedes in its opposition brief that there are several variables, including intervention time, that affect a patient's "door-to-balloon" time. (*See* Opp., p. 16, Fig. 4 and Kane Cert., Ex. F).

[8]  Deborah contends that Cooper Hospital in Camden is within the relevant geographic market it posits for emergent/primary angioplasty, yet PPMC is only five miles farther away from Virtua Memorial than Cooper.

low patient volumes, those patients may be treated within the 90 minutes that Deborah says marks the boundaries of the relevant market for primary/emergent angioplasty.[9]  Those basic logical flaws emphasize that Deborah's posited geographic market for emergent/primary angioplasty, which excludes the Philadelphia area, is both arbitrary and impermissibly narrow. *See Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986) (an arbitrary and overly narrow geographic market makes accurate antitrust analysis "impossible").

Even accepting Deborah's faulty premise for purposes of this motion, its exclusion of the Philadelphia area from the relevant geographic market for emergent/primary angioplasty is incorrect as a matter of law.  Deborah says that the 90 minute window represents the "gold standard" for emergent angioplasty. (Opp., p. 39).  The supposed fact that angioplasties performed in Philadelphia cannot, in Deborah's view, regularly satisfy that so-called "gold standard" does not, however, justify Deborah's attempt to carve Philadelphia out of the relevant geographic market since "the question for the Court is not whether one product is a perfect substitute for another, but whether the two products are 'reasonably interchangeable'" alternatives.  *Coast to Coast Entertainment, LLC v. Coastal Amusements*, No. 05-3977, 2005 U.S. Dist. LEXIS 26849, at *49 (D. N.J. Nov. 7, 2005).  Given that Deborah's entire case theory it built on the allegation that New Jersey patients are, in fact, receiving emergent angioplasty at PPMC in Philadelphia, there can be no plausible argument that Philadelphia hospitals are outside the market area where patients can "practicably turn" for those services.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

---

[9]  Deborah does not allege that Virtua Memorial patients cannot be catheterized at PPMC within the 90 minute window, nor could it. (*See* Kane Cert., Ex. F).

**D. Deborah Effectively Concedes That No Defendant Has Market Power In The Alleged Markets For Non-Emergent Cardiac Care.**

Deborah agrees that, for non-emergent cardiology procedures, the relevant product markets include Burlington County, as well as the "Philadelphia area," and it takes no issue with the judicially noticeable fact pointed out in the Penn Defendants' opening brief that, within those boundaries, there are numerous hospitals competing to provide cardiology services. (Dkt. 26-1, p. 24). Nevertheless, Deborah continues to stake out the untenable position that Virtua has market power in the markets for non-emergent cardiac procedures because it has a 32.2% market share in South Jersey for all medical procedures – not just cardiology. (Opp., p. 43, citing FAC, ¶ 47). However, as the court in *In re Set Top Cable Television Box Antitrust Litig.*, No. 08-1995, 2011 U.S. Dist. LEXIS 39001 (S.D.N.Y. April 8, 2011) held, such allegations are irrelevant because it "would be as if a plaintiff had adequately alleged a product market consisting of orange juice, but relied on defendant's position in the overall beverage industry as evidence of market power." *Id.* at *39.[10]

Knowing that its allegation concerning Virtua's size is a classic red herring, Deborah urges the Court to look to "other relevant factors" in order to find that Virtua has market power in the markets for non-emergent cardiac procedures, which encompass the Philadelphia area. (Opp., p. 43). Those other factors, however, are even more disastrous for Deborah's claims against the Penn Defendants. By Deborah's own admission, competition for cardiac services in the Philadelphia area is "stiff" and Pennsylvania hospitals do not have to reckon with the same regulatory entry barriers, such as the CON process, that hospitals in New Jersey face. (Opp., p.

---

[10] Even if Virtua held a 32.2% share of the market for cardiology procedures – and, there is no allegation that it does – that would still be too low to raise competitive concerns. *See AD/SAT v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999) (a share of "less than 40%" is insufficient to show market power) (citation omitted).

7).  Hence, in the markets for non-emergent cardiac services, which include "Philadelphia area"

hospitals, it is implausible that Virtua (or any other Defendant) would have market power

sufficient to restrain competition in a way that would contravene the antitrust laws.

### E.   Deborah's Theory Of Specific Intent As To The Penn Defendants Is Incoherent.

In order to establish specific intent for purposes of its Section 2 claim, Deborah must

allege facts plausibly demonstrating an intent by each of the Defendants that *one* of them achieve

monopoly power.  *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 257 (3d

Cir. 2010).  Deborah, however, has offered only the conclusory allegation that the Penn

Defendants specifically intended to bestow a monopoly on Virtua, notwithstanding that, for the

Penn Defendants to have such intent, they would need to have the express desire to exclude

themselves from the markets for advanced cardiac services to their own detriment.  (*See* Dkt. 26-

1, p. 29).  Rather than squarely address that fatal flaw in the pleading of their Section 2 claim

against the Penn Defendants, Deborah contends that "it is not unreasonable to allege that

[PPMC] would participate in a conspiracy to monopolize this market, especially if the conspiracy

also resulted in the elimination of the one hospital in the region that does not balance bill patients

or co-pays or deductibles."  (Opp., p. 49).

But that is not what Deborah alleges.  Deborah expressly asserts that the conspiracy (or

"common scheme") to which all Defendants supposedly had a "conscious commitment" was one

designed to give Virtua a monopoly position in the markets for advanced cardiac procedures.

(FAC, ¶ 220).  Despite being directly challenged to do so, Deborah has offered no plausible

explanation as to why the Penn Defendants would have specifically intended that Virtua achieve

that goal, and in the process, agree to their own elimination from the markets for advanced

cardiac procedures.  Instead, the only allegations in the FAC concerning the Penn Defendants'

intent are that they participated in the conspiracy for the purpose of "increasing their revenues" and "creating an influx of new patients" (FAC, ¶ 66), which is plainly insufficient to establish specific intent.  *See Howard Hess Dental Labs., Inc.*, 602 F.3d at 258 (the desire to "acquire, retain and/or increase its own business" does not establish specific intent).

## III.    <u>CONCLUSION</u>

For each of the foregoing reasons, and for the reasons set forth in the Penn Defendants' opening brief, Deborah's FAC should be dismissed with prejudice.

Dated:  June 30, 2011                            Respectfully submitted,

OF COUNSEL:                                      /s/      R. Brendan Fee
                                                 Robert A. White (RW-6063)
Jay H. Calvert, Jr. *(pro hac vice)*            rwhite@morganlewis.com
jcalvert@morganlewis.com                         MORGAN, LEWIS & BOCKIUS LLP
Mark P. Edwards *(pro hac vice)*                (A Pennsylvania Limited Liability Partnership)
medwards@morganlewis.com                         502 Carnegie Center
MORGAN, LEWIS & BOCKIUS LLP                      Princeton, NJ 08540
1701 Market Street                               Telephone:  (609) 919-6600
Philadelphia, PA  19103-2921
Telephone:  (215) 963-5000                               *-and-*

                                                 R. Brendan Fee (RF-4838)
                                                 bfee@morganlewis.com
                                                 MORGAN, LEWIS & BOCKIUS LLP
                                                 1701 Market Street
                                                 Philadelphia, PA  19103-2921
                                                 Telephone:  (215) 963-5000

                                                 Attorneys for Defendants,
                                                 Presbyterian Medical Center of the University
                                                 of Pennsylvania Health System d/b/a Penn
                                                 Presbyterian Medical Center, University of
                                                 Pennsylvania Health System, Penn Cardiac
                                                 Care at Cherry Hill and Clinical Health Care
                                                 Associates of New Jersey, P.C.

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused copies of the foregoing Reply Brief of the Penn Defendants in Support of Their Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) to be filed with the United States District Court for the District of New Jersey, which caused electronic copies thereof to be served upon the following counsel of record:

Anthony Argiropoulos
Thomas Kane
Sills Cummis & Gross, P.C.
650 College Road, East
Princeton, New Jersey 80540
Email: aargiropoulos@sillscummis.com
        tkane@sillscummis.com

*Counsel for Plaintiff,*
Deborah Heart and Lung Center

James J. Ferrelli
Philip H. Lebowitz
John E. Sidoni
Duane Morris LLP
1940 Route 70 East, Suite 200
Cherry Hill, New Jersey 08003
Email: jjferrelli@duanemorris.com
        lebowitz@duanemorris.com
        jesindoni@duanemorris.com

*Counsel for Defendants,*
Virtua Health, Inc. and Virtua
Memorial Hospital Burlington County

Robert V. Dell'Osa
Cozen O'Connor
457 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002
Email:  rdellosa@cozen.com

*Counsel for Defendant,*
The Cardiology Group, P.A.

Dated:  June 30, 2011                    /s/     R. Brendan Fee
                                                 R. Brendan Fee