NOT FOR PUBLICATION                [Dkt. No. 26, 27, 29, 45]

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| DEBORAH HEART AND LUNG CENTER,<br><br>    Plaintiff,<br><br>v.<br><br>PENN PRESBYPYTERIAN MEDICAL<br>CENTER, et al.,<br><br>    Defendants. | Civil No. 11-1290 (RMB)(KMW)<br><br><br>**OPINION** |

Appearances:

        Anthony Argiropoulos
        Scott B. Murray
        Thomas Kane
        Sills Cummis & Gross, P.C.
        650 College Road East
        Princeton, New Jersey 08540

            Attorneys for Plaintiff Deborah Heart and Lung Center

        Robert A. White
        Morgan, Lewis & Bockius LLP
        502 Carnegie Center
        Princeton, NJ 08540

        Jay H. Calvert, Jr.
        R. Brendan Fee
        Morgan, Lewis & Bockius LLP
        1701 Market Street
        Philadelphia, PA 19103

            Attorneys for Defendants Presbyterian Medical Center
            of the University of Pennsylvania Health System,
            University of Pennsylvania Health System, Penn Cardiac
            Care at Cherry Hill, and Clinical Health Care
            Associates of New Jersey, P.C.

James J. Ferrelli
Philip H. Lebowitz
John E. Sindoni
Duane Morris LLP
1940 Route 70 East, Suite 200
Cherry Hill, New Jersey 08003

> Attorneys for Defendant Virtua Health, Inc. and Virtua
> Memorial Hospital Burlington County

Robert V. Dell'Osa
Cozen O'Connor P.C.
457 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002

Ronald F. Wick
Cozen O'Connor P.C.
The Army and Navy Building
1627 Street, NW, Suite 1100
Washington, D.C. 20006

> Attorneys for The Cardiology Group, P.A.

**BUMB**, United States District Judge:

Plaintiff Deborah Heart and Lung Center ("Plaintiff"), a not-for-profit charity hospital, alleges two claims against the Defendants – Virtua Health, Inc. and Virtua Memorial Hospital Burlington County (the "Virtua Defendants"), Presbyterian Medical Center of the University of Pennsylvania Health System, University of Pennsylvania Health System, Penn Cardiac Care at Cherry Hill, and Clinical Health Care Associates of New Jersey, P.C. (the "Penn Defendants"), and The Cardiology Group, P.A. ("Defendant CGPA").

First, Plaintiff claims that the Defendants conspired with one another, in violation of Section 1 of the Sherman Act, to

exclude Plaintiff from the market for certain critical, advanced cardiac interventional procedures, thereby restricting consumers' choice of providers for these procedures, and forcing consumers to pay higher prices.

Second, Plaintiff claims that these efforts were part of an overlapping conspiracy by the Defendants, in violation of Section 2 of the Sherman Act, for the Virtua Defendants to monopolize the market for emergent/primary angioplasties - a submarket of the larger market for advanced cardiac interventional procedures that is the subject of the first alleged conspiracy. Defendants have moved to dismiss on a number of grounds.[1]

For the reasons that follow, Defendants' motion to dismiss is DENIED with respect to Plaintiff's Section 1 claim and GRANTED with respect to Plaintiff's Section 2 Claim.

I.   Background

    A.   The Plaintiff

    Plaintiff is a 139-bed hospital located in Burlington

---

[1]   In briefing on the motions to dismiss, Plaintiff moved for leave to file a sur-reply in further opposition to the motions, attaching the sur-reply brief.  Plaintiff's attachment of the brief was improper and Plaintiff is cautioned that, going forward, it is to obtain this Court's permission before filing any supplemental briefing.  As such, this Court has not considered the improperly filed sur-reply brief. The Court previously exercised its discretion to deny the motion to file the sur-reply brief.  See Docket No. 48; Fenza's Auto, Inc. v. Montagnaro's Inc., No. 10-3336, 2011 WL 1098993, at *4 (D.N.J. Mar. 21, 2011)("[T]he court has broad discretion to consider supplemental briefing as appropriate and fair.").

County, New Jersey and is nationally renowned for the quality of
its cardiology and pulmonary services, as well as its high
scores for patient satisfaction.[2]  Uniquely, Plaintiff is one of
only three hospitals in the United States that are legally
exempt from collecting insurance co-pays and deductibles from
patients. Prior to 2010, Plaintiff lacked an emergency room and
Defendant Virtua Memorial Hospital was the primary and, at
times, only emergency room in what Plaintiff contends is the
relevant geographic market for emergency care.

    B.   The Competitive Landscape

Plaintiff competes with the much larger Virtua Defendants,
who operate three hospitals in the area with nearly 900 beds.
Since 2005, the Virtua Defendants have made Defendant CGPA the
exclusive provider of cardiology services at Defendant Virtua
Memorial Hospital, one of the three hospitals the Virtua
Defendants operate.

Until 2007, the Virtua Defendants were unable, under New
Jersey law, which regulates what procedures hospitals may
perform based on area need by issuing Certificates of Need, to
provide any of the advanced cardiac interventional procedures
that are at issue in this litigation.  Those procedures fall in
to two broad categories: (1) elective - non-emergent

---

2    The allegations contained in Plaintiff's Amended Complaint are accepted
    as true for purposes of the motion to dismiss.

angioplasty, electrophysiology, and cardiac surgery (the "Elective Procedures"); and (2) emergency - emergent/primary angioplasty (the "Emergency Procedures").  Plaintiff contends that the relevant geographic market for the Elective Procedures consists of Burlington County, New Jersey, as well as parts of Atlantic, Camden, Mercer, and Ocean Counties, also in New Jersey, and the Philadelphia area.  As for the relevant geographic market for Emergency Procedures, Plaintiff claims that the market is slightly smaller and consists of Burlington County, as well as portions of Camden, Mercer, and Ocean Counties, but not Atlantic County or the Philadelphia area.

Historically, because the Virtua Defendants were largely unable to perform the procedures at issue[3], Virtua transferred patients requiring these procedures to other area hospitals. These hospitals included New Jersey hospitals who had obtained a Certificate of Need, like Plaintiff and two other hospitals who also compete with Plaintiff - Cooper Hospital University Medical Center ("Cooper") and Our Lady of Lourdes Medical Center ("Lourdes").  They also included, for Elective Procedures, Defendant Presbyterian Medical Center of the University of Pennsylvania Health System ("Penn Presbyterian"), a Philadelphia-based hospital, which was entitled to perform the

---

3    In 2007, the Virtua Defendants, who previously lacked a Certificate of Need to perform any of the procedures at issue, were authorized to perform a limited number of procedures on an emergency basis.

procedures under Pennsylvania law. According to Plaintiff, patients requiring Emergency Procedures were generally not transferred to Penn Presbyterian because the transit time would have been considered unacceptable due to the need for these patients to receive more immediate care.  Most patients, for both Elective and Emergency Procedures, however, were simply transferred to Plaintiff.

All this changed when, according to Plaintiff, the Defendants conspired to exclude Plaintiff and, ultimately, drive it out of business and allow Defendant Virtua Memorial Hospital to monopolize the market for Emergency Procedures.

C.   The Alleged Conspiracies

According to Plaintiff, Defendants entered into an anti-competitive conspiracy in 2007 premised on two interlocking written agreements: first, between the Virtua Defendants and Defendant CGPA, making CPGA the exclusive provider of cardiology services at Virtua; and second, between CGPA and the Penn Defendants, making the Penn Defendants the exclusive recommended referral of CGPA.  These agreements, Plaintiff contends, form the building blocks of the larger conspiracies to exclude Plaintiff from receiving transfers from the Virtua Defendants, drive it out of the market, and allow the Virtua Defendants to monopolize the Emergency Procedures market. Plaintiff claims that, as a result of these conspiracies, the Virtua Defendants

transferred almost all patients requiring advanced cardiac care to the Penn Defendants.  Plaintiff claims that, to enforce this larger agreement, the Virtua Defendants monitored, and reported to the other Defendants, instances of "leakage" – occasions when Virtua Defendants' patients were transferred to other hospitals besides those of the Penn Defendants.[4]

Plaintiff alleges that, in many instances, in contravention of patients' rights under the New Jersey Patients' Bill of Rights, patients of the Virtua Defendants had their requests to transfer to Plaintiff denied, or were coerced not to transfer through the use of false and malicious statements. According to Plaintiff, the Virtua Defendants attempted to compensate for the greater distance to Penn Presbyterian, which previously made Penn an unattractive choice for patients requiring Emergency Procedures, by utilizing helicopter transfers. However, Plaintiff alleges that the helicopter transfers still regularly exceeded medically recommended transfer time limits.

---

[4]    Plaintiff submitted an email discussing a "leakage report" in an exhibit attached to its opposition to the motions to dismiss.  Because the exhibit, and Plaintiff's other attachments submitted in opposition to the motion to dismiss, are consistent with the facts plead in the Amended Complaint, this Court may exercise its discretion to consider them without converting the motions to dismiss into motions for summary judgment.  Help at Home, Inc. v. Medical Capital, L.L.C., 260 F.3d 748, 752-53 (7th Cir. 2001)("A plaintiff need not put all of the essential facts in the complaint; he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint."(quotation and citation omitted); Kulwicki v. Dawson, 969 F.2d 1454, 1462 (3d Cir. 1992)("A trial judge has the discretion to consider evidence outside the complaint in ruling on motions to dismiss.").

Plaintiff claims that these actions resulted in harm to both Plaintiff and consumers: Plaintiff lost business to the Penn Defendants and consumers faced higher costs, less choice, and greater medical risk. In particular, according to Plaintiff, patients transferred to the Penn Defendants faced higher fees in the form of: "out of pocket expenses related to insurance co-pays and deductibles and balance billing" which do not occur at Deborah.  Medicare, Medicaid, and third party insurers also faced increased costs from lengthier ambulance transportation to Penn Presbyterian and helicopter transport.  Patients and insurers were both harmed because, according to Plaintiff, the conspiracy enabled the Penn Defendants to charge supracompetitive prices for the procedures at issue.  Finally, Patients were deprived of their choice in hospital and, in the case of Emergency Procedures, subjected to unnecessary medical risk because of the lengthier transport time.

II.  <u>Standard</u>

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 262 n.27 (3d Cir. 2010) (quoting <u>Ashcroft v. Iqbal</u>, --- U.S. ---, 129 S.Ct. 1937, 1949 (2009) (internal quotations omitted)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 129 S.Ct. at 1949).

The Court conducts a three-part analysis when reviewing a claim:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an  entitlement for relief.

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010)(quotations and citations omitted); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009)(" . . . [A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts.").

III. Analysis

Plaintiff makes two claims: (1) that Defendants have violated Section 1 of the Sherman Act (conspiracy to restrain trade); and (2) that Defendants have violated Section 2 of the Sherman Act (conspiracy to monopolize the Emergency Procedures market).[5]  Defendants have moved for dismissal of both claims

---

[5]   The Amended Complaint's pleads a Section 2 claim with respect to both the Elective and Emergency Procedures markets. However, in Plaintiff's motion to dismiss opposition briefing, Plaintiff solely addressed the Emergency Procedures market and, at oral argument, Plaintiff confirmed that its Section 2 claim was limited to the Emergency Procedures market.

based on lack of antitrust standing and failure to meet the
elements of Section 1 and 2 claims.  The Court first turns to
the standing issue.

> A.   Plaintiff Has Antitrust Standing To Maintain Its
>      Claims.

Defendants argue that Plaintiff lacks antitrust standing to
pursue its claims.  The Third Circuit applies a 5-factor test to
assess antitrust standing.   The factors are:

> (1)  the causal connection between the antitrust violation
>      and the harm to the plaintiff and the intent by the
>      defendant to cause that harm, with neither factor
>      alone conferring standing;
>
> (2)  whether the plaintiff's alleged injury is of the type
>      for which the antitrust laws were intended to provide
>      redress;
>
> (3)  the directness of the injury, which addresses the
>      concerns that liberal application of standing
>      principles might produce speculative claims;
>
> (4)  the existence of more direct victims of the alleged
>      antitrust violations; and
>
> (5)  the potential for duplicative recovery or complex
>      apportionment of damages.  Angelico v. Lehigh Valley
>      Hosp., Inc., 184 F.3d 268, 274 (3d Cir. 1999)(citation
>      omitted).

The first two factors relate to whether Plaintiff has
suffered an "antitrust injury."  See Daniel v. Am. Bd. of
Emergency Med., 428 F.3d 408, 443 (2d Cir. 2005).  The final
three factors relate to whether Plaintiff would be an "efficient
enforcer" of the antitrust laws whose interest would be "aligned
with those of consumers generally."  Id.; Reddy v. Puma, No.

10

1:06CV1283, 2006 WL 2711535, at *5 (E.D.N.Y. Sept. 21, 2006).

Importantly, in assessing these factors, this Court assumes the

alleged conduct would constitute an antitrust violation.

Steamfitters Local Unionn No. 420 Welfare Fund v. Philip Morris,

Inc., 171 F.3d 912, 926 n.7(3d Cir. 1999)( "assum[ing] for the

sake of assessing plaintiffs' antitrust standing that the

conduct in which defendants allegedly engaged would constitute

such a violation."); Daniel, 428 F.3d at 437 (assuming that

alleged conduct was antitrust violation in assessing antitrust

violation to avoid blurring antitrust standing and merits);

Glaberson v. Comcast Corp., No. 03-6604, 2006 WL 2559479, at *4-

5 (E.D.Pa. Aug. 31, 2006)(citing Antitrust Law by Phillip E.

Areeda and Herbet Hovenkamp for the proposition that "[t]o test

standing in a private suit . . . the court should assume the

existence of a violation and then ask whether the [standing

elements] are shown"). In light of this principle, the

"antitrust injury" analysis does not depend on whether Plaintiff

has plausibly alleged anticompetitive harm to the market.  St.

Clair v. Citizens Financial Group, No. 08-1257, 2008 WL 4911870,

at *5 (D.N.J. Nov. 12, 2008)(holding that harm to the market "is

not required for antitrust standing, but instead is relevant to

show restraint of trade when proving the merits of an antitrust

claim.").  That factor goes to the merits and whether a

violation occurred, not a plaintiff's standing.  Id.  Applying

these factors, Plaintiff has suffered an antitrust injury and
would be an efficient enforcer of the antitrust laws.  Plaintiff
therefore has antitrust standing.

First, Plaintiff has plausibly alleged that Defendants'
conspired to harm Plaintiff and that that conspiracy caused
Plaintiff harm in the form of lost patient revenues.  Second,
Plaintiff's loss of revenues from its exclusion is among the
types of harm the antitrust laws were designed to prevent.
Angelico, 184 F.3d at 274 ("Turning to the second element,
whether Angelico's alleged injury is of the type the antitrust
laws were meant to redress, we conclude that the injury he
suffered, when shut out of competition for anticompetitive
reasons, is indeed among those the antitrust laws were designed
to prevent.").  Third, Plaintiff's injuries are "clearly [a]
direct (and substantial) . . . result of the alleged conspiracy"
as patients that likely would have transferred to Plaintiff were
instead sent to the Penn Defendants.  Id. at 275.  Fourth, there
are no more direct victims of the alleged conspiracy.  Other
excluded hospitals are in the same position as Plaintiff.
Insurers and individual consumers harmed by the alleged
antitrust violations are no more direct and the latter are less
likely to sue for this type of violation, absent a class action,
given the small amount of damages each would have sustained on
an individual basis.  Fifth, and finally, there is no potential

for duplicative recovery or complex apportionment of damages since the other hospitals and consumers would have wholly separate and independent damages.  Id.  More generally, Plaintiff's interest is aligned with consumers because both are interested in protecting consumer choice and access to a lower cost and, in the case of Emergency Procedures, medically superior hospital.

Therefore, Plaintiff has antitrust standing to maintain its claims and this Court must turn to whether Plaintiff has plausibly alleged the elements of its antitrust claims.

B.   Plaintiff Has Plausibly Alleged A Section 1 Claim.

"To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action."  Black Box Corp. v. Avaya, Inc., No. 07-6161, 2008 WL 4117844, at *7 (D.N.J. Aug. 29, 2008)(quotation and citation omitted).  Defendants have vigorously challenged Plaintiff's allegations with respect to each of these elements. However, because Plaintiff has satisfied each of these elements, Defendants' motions will be denied.

1.   Plaintiff Has Plausibly Alleged Concerted Action By The Defendants.

"Concerted action is established where two or more distinct entities have agreed to take action against the plaintiff." Gordon v. Lewistown Hosp., 423 F.3d 184, 204 (3d Cir. 2005). Entities agree where they share "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." West Penn Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 99 (3d Cir. 2010). Agreement may be plead through "direct or circumstantial evidence, or a combination of the two." Id.

Plaintiff has adequately plead, through both direct and circumstantial evidence, that Defendants are engaging in concerted action to exclude Plaintiff from receiving patient transfer from the Virtua Defendants. Directly, Plaintiff has demonstrated that there are two interlocking written agreements: first, between the Virtua Defendants and Defendant CGPA, making CPGA the exclusive provider of cardiology services at Virtua; and second, between CGPA and the Penn Defendants, making the Penn Defendants the exclusive recommended referral of CGPA. According to Plaintiff, these interlocking agreements, in practice, make the Penn Defendants the exclusive advanced cardiac procedural referral of the Virtua Defendants. This direct evidence of agreement is supported by four strong pieces of circumstantially pled evidence: (1) the powerful shift in the Virtua Defendants' transfer pattern (Am. Compl. ¶¶ 75, 77); (2)

that the shift in patients needing Emergency Procedures was made despite increased medical risks and costs (Am. Compl. ¶¶ 181-185, 208); (3) coercive conduct by the Virtua Defendants and CGPA to prevent patients from exercising their choice of hospital, in the face of a statutory obligation to allow that very choice (Am. Compl. ¶¶ 78-174)[6]; and (4) the Defendants' dissemination and discussion of leakage reports. (See Certification of Thomas Kane in Support of Plaintiff's Opposition to Motions to Dismiss, Ex. D).

The Virtua Defendants and CGPA argue that Plaintiff has failed to establish concerted action because Plaintiff failed to show that the events at issue are <u>more</u> plausibly the result of concerted action than of parallel conduct because they lacked an economic motive to engage in the alleged concerted action. The Court rejects that argument for three reasons.

First, Defendants overstate the Plaintiff's burden on a motion to dismiss. To survive a motion to dismiss, a plaintiff's "allegations need not rule out all potential alternative explanations" and instead must only adduce enough factual material taken as true to plausibly suggest an agreement

---

[6]   The Penn Defendants contend that the alleged coercive conduct amounts to no more than "garden-variety business torts" that do not rise to the level of antitrust claims. That some of the conduct allegedly employed by Defendants in furtherance of the alleged antitrust conspiracy was also tortious is immaterial to the viability of Plaintiff's antitrust claims. Tortious and anticompetitive conduct are not mutually exclusive.

was made.  See In re Magneisum Oxide Antitrust Litig., No. 10-
54983, 2011 WL 5008090, at *15 (D.N.J. Oct. 20, 2011).  As
described above, Plaintiff has plainly met this burden.

Second, Plaintiff has, in fact, plausibly and specifically
alleged economic incentive from these Defendants.  The Virtua
Defendants and CGPA both stood to gain from the potential
elimination of a rival.  In an e-mail, CGPA's President
contemplated the possibility of Plaintiff being driven out of
business and hypothesized that that process could be accelerated
by no longer transferring certain cardiac patients there.
Plaintiff's exit from the market would result in new patients
and an enhanced possibility of the Virtua Defendants being
awarded a Certificate of Need to perform additional cardiac
interventional procedures – a possibility the Virtua Defendants
are alleged to have considered and studied.

Third, these Defendants have failed to offer a plausible
explanation that the events at issue were the result of
independent conduct, rather than the result of an agreement.

Finally, the Penn Defendants argue that a Section 1 claim
requires, and they lacked, a unity of purpose with the other
Defendants, since the alleged goal of their co-defendants was to
shutdown Deborah, and their economic motivation was not
predicated on Deborah's shutdown, but on a the "influx of new
patients" as a result of the transfers – a legitimate business

interest.  But the complaint need not have alleged "that the parties to an agreement had identical motives" or that a party's motive was anti-competitive - only that they "had a plausible reason to participate in the conspiracy." Trans World Techs., Inc. v. Raytheon Co., No. 06-5012, 2007 WL 3243941, at *4 (D.N.J. Nov. 1, 2007); Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1153-54 (9th Cir. 2003)(holding that the plaintiff "need not prove intent to control prices or destroy competition to demonstrate the element of an agreement . . . among two or more entities.")(quotation and citation omitted).[7] Therefore, even if the Penn Defendants had no desire to eliminate Plaintiff and were merely motivated by economic self-interest, Plaintiff has sufficiently alleged that the Penn Defendants participated in the alleged conspiracy and their reason for participation: the large influx of new patients. Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 212-14 (3d Cir. 1992)(explaining that a conspirator in a scheme to

---

[7]     See also Petruzzi's IGA Supermarket, Inc. v. Darling-Delaware  Co., Inc., 998 F.2d 1224, 1243 (3d Cir. 1993)("However, we have made it clear that the defendants need not share the same motive.  Rather, all that is required is they each have a motive to conspire."); Acme Markets, Inc. v. Wharton Hardware and Supply Corp., 890 F. Supp. 1230, 1239 (D.N.J. 1995)(holding that alleged co-conspirators may have "independent motivations" so long as they "acted in concert to restrain competition through their common objective of enforcing the restrictive covenant."); In re Processed Egg Prods. Antitrust Litig., No. 08-md-02002, 2011 WL 4465355, at *7 (E.D.Pa. Sept. 26, 2011(holding that even reluctant co-conspirators may be held liable and that "the issue is whether the pleading delineates to some sufficiently specific degree that a defendant purposefully joined and participated in the conspiracy.").

eliminate plaintiff did not need to share a commitment to the elimination of the rival and could instead simply be motivated by its own financial incentives).

Accordingly, Plaintiff has plausibly alleged the first element of a Section 1 claim.

2.    Plaintiff Has Plausibly Alleged Anticompetitive Effects Within The Relevant Product And Geographic Markets.

A plaintiff may demonstrate that concerted action produced adverse, anticompetitive effects within the relevant product and geographic markets in two ways: (1) through direct evidence of actual anticompetitive effects; or (2) through proof of the defendant's market power, which acts as a proxy for anticompetitive effect.  Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010).[8]

---

[8]    Defendants argue that, in order to demonstrate competitive harm, Plaintiff was required, and failed, to demonstrate that the alleged exclusionary conduct resulted in a significant market foreclosure.  But market foreclosure analysis, like market power analysis, is merely a surrogate for a demonstration of actual anticompetitive effect. Jonathan M. Jacobson, Exclusive Dealing, "Foreclosure," And Consumer Harm, 70 ANTITRUST L.J. 311, 362 (2002).  As Jonathan Jacobson, former member of the Congressional Antitrust Modernization Commission, persuasively writes:

> But just as foreclosure is no more a magic wand for plaintiffs, neither does the absence of "substantial foreclosure" provide a defense for firms whose exclusive dealing practices in fact threaten significant harm. The foreclosure concept was developed as a useful proxy for analyzing harm to competition. If "substantial foreclosure" was shown, the courts presumed that the competitive process had been damaged and the restraint was condemned accordingly. As the sophistication of antitrust analysis has increased, however, the foreclosure proxy has been found inadequate. A large amount of percentage foreclosure, without more, proves nothing, but the absence of percentage foreclosure is equally unilluminating. In all cases, the relevant

While, in both cases, a plaintiff must make some showing of a relevant market, where a plaintiff demonstrates direct evidence of actual anticompetitive effects, the plaintiff's burden is diminished and it must only demonstrate "the rough contours of a relevant market."   In re Compensation of Managerial Professional and Technical Employees Antitrust Litig., No. 02-CV-2924, 2008 WL 3887619, at *7 (D.N.J. Aug. 20, 2008)(quotation omitted).  Actual anticompetitive effects can be shown through reduced output, increased prices, decreased quality, and loss of consumer choice.[9]  Tunis Bros. Co., Inc. v. Fort Motor Co., 952 F.2d 715, 728 (3d Cir. 1991)("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services.)(quotation and citation omitted); Acme Markets, 890 F. Supp. at 1240 (same); United States v. Brown Univ. in Providence in State of Rhode Island, 5. F.3d 658, 675 (3d Cir. 1993)(noting that "[e]nhancement of consumer choice is a traditional objective of

---

question is instead whether there has been an adverse effect on price, output, quality, choice, or innovation in the market as a whole. Id.

As described below, Plaintiff has adequately alleged actual anticompetitive effect, obviating any need for a demonstration of market foreclosure.

[9] Defendants argue that Plaintiff cannot demonstrate anticompetitive effects because Plaintiff cannot show reduced output.  However, reduced output is just one method of demonstrating anticompetitive harm.  New York Medscan LLC v. New York University School of Medicine, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006)("A plaintiff asserts harm to competition by alleging adverse effects on the price, quality, or output of the relevant good or service.")(emphasis added); Angelico, 184 F.3d at 276 (3d Cir. 1999)(same).

the antitrust laws and has also been acknowledged as a procompetitive benefit."); <u>Rome Ambulatory Surgical Center LLC v. Rome Memorial Hosp., Inc.</u>, 349 F. Supp. 2d 389, 410 (N.D.N.Y. 2004)(recognizing loss of consumer choice as a significant injury to competition).

Because the Court concludes that Plaintiff has plausibly alleged direct anticompetitive effects, there is no need to, and the Court will not, separately assess whether Plaintiff adequately alleged market power.

a. Plaintiff Plausibly Alleged Competitive Harm

While Plaintiff's allegations of supracompetitive pricing for the procedures at issue are too conclusory to be credited[10], Plaintiff has sufficiently alleged competitive harm in the form of: (1) higher prices through co-pays and related expenses and increased transportation costs, particularly helicopter transport costs; (2) reduced quality of care in Emergency Procedures, where Plaintiff has plausibly alleged that the increased transport time may cause adverse medical outcomes[11];

---

[10]    <u>See Burns v. Lavender Hill Herb Farm, Inc.</u>, No. Civ.A 01-7019, 2005 WL 1006321, at *3 (E.D.Pa. Apr. 28, 2005)(rejecting conclusory allegations of higher prices); <u>Process Controls Int'l, Inc. v. Emerson Process Mgmt.</u>, No: 4:10CV645, 2011 WL 403121, at *4 (E.D.Mo. Feb. 1, 2011)(same).

[11]    At oral argument, the Virtua Defendants contended that there are two time-based components to ensuring proper medical care for these procedures: the transport time to the hospital and the time, once at the hospital, before a patient receives the proper treatment. They argued that the Amended Complaint alleges only that the transport time is shorter for transfer to Deborah and, without allegations as to wait

and (3) loss of consumer choice as Plaintiff is removed as an option for Virtua patients, even in cases where they request to be transferred there but are denied.  <u>Farina v. United Parcel Service</u>, MDL-1339, 2002 WL 1766554, at *10 (S.D.N.Y. July 31, 2002)(holding that denial of ability to purchase from lower-priced competitor was anticompetitive harm); <u>Bearing Distributors, Inc. v. Rockwell Automation, Inc.</u>, No. 06-CV-831, 2006 WL 2709779, at *7 (N.D.Oh. Sept. 20, 2006)(holding that removal of lower-priced, superior service product from market was antitrust harm).  These are real competitive harms to a significant population.

They do not reflect, as Defendants alternately contend: (1) a <i>de minimis</i>, non-cognizable harm to competition; (2) a harmless substitution of one provider of the procedures at issue – Plaintiff – for another – the Penn Defendants; or (3) "increased competition" from the Penn Defendants.  Those conclusions do not follow.  Prior to the alleged conspiracy, the Penn Defendants competed freely with Plaintiff and other hospitals in the area.  Once the conspiracy began, however, Plaintiff alleges that it

---

time at Deborah, does not plausibly establish that transfer to Penn subject patients to unnecessary medical risks.  This is an overly technical reading of the Amended Complaint.  Plaintiff has, particularly in light of the historic practice of transferring patients to it, plausibly alleged that there are no medical issues that prevent transport to it from Virtua.  It is a fair inference from these allegations, and the allegations that Defendants' practice subjects patients to unnecessary medical risk, that there is no issue with hospital waiting time at Deborah that would negate its transportation time advantage.

was largely excluded from competition.  Thus, the diversion of patients at issue was not the product of increased competition from the Penn Defendants, who were already competitors, but the exclusion of Plaintiff.  That exclusion was harmful, not harmless, to consumers for the reasons detailed above and affected a significant harm on the market.  Plaintiff has therefore, contrary to Defendants' arguments otherwise, satisfied its burden to show anticompetitive harm that was more than a *de minimis* restraint of trade.  <u>Tunis</u>, 952 F.2d at 728.

Defendants also argue that the higher prices patients transferred to the Penn Defendants pay, through co-pays and other payments that they do not need to pay at Plaintiff, cannot constitute a competitive harm because: (1) they are the product of a regulatory anomaly rather than Plaintiff's competitive merits; (2) the regulatory exemption is itself anti-competitive; and (3) holding otherwise would mean that any transfer, other than to Plaintiff, could constitute a competitive harm.  On the first issue, Defendants have cited no authority, and this Court can find none, suggesting that it would be improper to find anticompetitive harm because of Plaintiff's admitted regulatory advantage.[12]  Defendants' argument wrongly places the focus on

---

[12]    The Court ordered supplemental briefing on this issue.  Defendants' authority submitted in response is inapposite.  In <u>Schuylkill Energy Resources v. Pa. Power & Light Co.</u>, 113 F.3d 405 (3d Cir. 1997), the Court rejected an energy supplier's contention that a utility company's failure to purchase energy from it resulted in a higher rates to

whether Plaintiff is competing on the merits, when antitrust law is concerned, as evidenced by the required elements of a Section 1 claim, with Defendants' conduct and its effect on competition. Given these facts and antitrust law's strong emphasis on promoting lower prices for consumers[13], this Court finds that the higher prices patients pay can constitute an anticompetitive harm.  On the second issue, similar logic applies: Defendants' conduct and its effect on competition is at issue in this litigation, not the merits of the exemption.  On the third issue, competitive harm would not arise, based on the Court's interpretation, in every transfer.  It is only implicated where, as here, it is the product of an exclusionary transfer policy. In any event, even if these higher prices were not credited as antitrust injuries, Plaintiff has plausibly alleged meaningful

---

consumers on two grounds.  Id. at 414-15.  First, the court found that the utility's rates were determined by regulators, not the marketplace, and therefore any complaints were properly directed to regulatory authorities.  Id.  Defendants have not identified any corresponding authority here that would make antitrust review inappropriate  Second, the plaintiff there was found to be only a supplier to the utility, not its competitor, so could not participate in the market for consumers. Id. at 415.  Plaintiff here, in contrast, is in direct competition with Defendants.  In In re Canadian Imp. Antitrust Litig., 470 F.3d 785 (8th Cir. 2006), the court found that prescription drug purchasers failed to allege anti-competitive conduct where they alleged that drug companies acted to prevent the importation of cheaper brand name drugs from Canada.  Id. at 791  There, unlike here, the inability to access a cheaper alternative was caused, at the start, by government regulations, not the Defendants' exclusionary conduct.  Id. at 791-92. The plaintiffs there could not allege, as Plaintiff can here, "that prior to the alleged anti-competitive conduct of the defendants" consumers had access to the cheaper alternative.  Id. at 792.

[13]   See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223 (1993)(holding, in the predatory pricing context, that "[l]ow prices benefit consumer regardless of how those prices are set")(quotation and citation omitted).

competitive harms to consumer choice and, with respect to Emergency Procedures, loss in quality.

Finally, Defendants argue that the alleged agreement is not anticompetitive, and therefore there is no anticompetitive harm, because there is no duty to cooperate. But the anticompetitive harm alleged is the exclusion of Plaintiff as a choice for patients, not that Defendants have an affirmative obligation to direct patients to Plaintiff, or give Plaintiff access to Defendants' patients.

b.   Plaintiff Has Met Its Burden To Allege Relevant Markets.

Plaintiff has also sufficiently alleged, at a minimum, the rough contours of the marketplace for both the Elective and Emergency Procedures. For the former, Plaintiff has adequately alleged a marketplace in Southern New Jersey and Philadelphia. For the latter, Plaintiff has adequately alleged a more restricted geographic market, which excludes Philadelphia, in light of the need for patients needing emergency treatment to receive more rapid care and the alleged greater transport time in transit to Philadelphia. That the Virtua Defendants are, in fact, transferring patients to the Penn Defendants in Philadelphia for Emergency Procedures does not disturb this analysis. Plaintiff has plausibly alleged that Philadelphia hospitals are not a suitable medical alternative and that

patients are only being transferred there as a result of the conspiracy. It is therefore plausible that Philadelphia is not part of the relevant market.  In any event, regardless of whether Philadelphia is part of the market for Emergency Procedures, Plaintiff's allegations certainly allege the "rough" market contours required in a direct evidence case.

3.   Plaintiff Has Plausibly Alleged That The Concerted Action Was Illegal.

Concerted action that unreasonably restrains trade is illegal.  American Needle, Inc. v. Nat'l Football League, 130 S.Ct. 2201, 2212 (2010).  "At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets."  West Penn, 627 F.3d at 100.  As discussed above, Plaintiff has plausibly alleged competitive harm. Therefore, Plaintiff has plausibly alleged that Defendants' concerted actions were illegal.

4.   Plaintiff Has Plausibly Alleged That It Was Injured As A Proximate Result Of The Concerted Action.

Plaintiff has alleged that it has lost revenues because patients who would have sought treatment at its hospital are instead diverted to the Penn Defendants as the result of Defendants' conspiracy.  Therefore, Plaintiff has plausibly alleged that it was injured, in the form of lost patients and revenues, as a proximate result of Defendant's concerted

25

actions.

      C.    Plaintiff Has Failed To Plausibly Allege A Section 2
          Claim.

     The elements of a conspiracy to monopolize include at least

three elements: "(1) a combination or conspiracy; (2) an overt

act in furtherance of the conspiracy; and (3) specific intent to

monopolize." <u>Black Box</u>, 2008 WL 4117844, at *8.  Courts are

divided on whether a fourth element – a dangerous probability of

successful monopolization – is required to establish the claim.

<u>Id.</u>  This Court agrees with those courts that have concluded

that a dangerous probability of success is not required.[14]  As

the Second Circuit has held:

> Congress outlawed the conspiracy itself. Once a plaintiff
> establishes a conspiracy with a specific intent to
> monopolize, proof of success or impending success is
> irrelevant.

<u>Int'l Distribution Centers, Inc. v. Walsh Trucking Co., Inc.</u>,

812 F.2d 786, 796 n. 8 (2d Cir. 1987)(citations omitted).

     However, while a dangerous probability of success is not a

required element, the likelihood of success may be highly

significant to whether the defendants could plausibly have had

the specific intent to monopolize the market at issue.  <u>Emigra</u>

---

[14]    At oral argument, Plaintiff articulated its belief that it was, in
fact, obligated to demonstrate a dangerous probability of successful
monopolization.  While the Court does not adopt this standard because
it believes that standard is incorrect, the differing standards are
immaterial here.  The same facts, discussed below, that demonstrate the
implausibility of Defendants having the intent to successfully
monopolize, would also render implausible Plaintiff's claim that
Defendants had a dangerous probability of success.

Group v. Fragomen, Del Rey, Bernsen & Loewy, 612 F. Supp. 2d
330, 363 (S.D.N.Y. 2009)("And while rigorous proof of a relevant
market and the likelihood of monopolization is not required in
this Circuit on a conspiracy to monopolize claim, the relevant
market and the likelihood of its monopolization may have a
significant bearing on whether the requisite specific intent to
monopolize is present."); Virginia Vermiculite Ltd. V. W.R.
Grace & Co., 144 F. Supp. 2d 558, 592 (W.D.Va. 2001)("But where
actions are ambiguous the existence and extent of market power
may make the inference of specific intent from conduct more or
less plausible.")(quotation and citation omitted).  That
specific intent to monopolize must be more than knowing and must
be shared by all the conspirators. ID Security Systems Canada,
Inc. v. Checkpoint Systems, Inc., 249 F. Supp. 2d 622, 660
(E.D.Pa. 2003)(holding that the alleged co-conspirators must
share the intent that would-be-monopolist obtain a monopoly);
Int'l Distribution, 812 F.2d at 796 (same); In re Microsoft
Corp. Antitrust Litig., 127 F. Supp. 2d 728, 731 (D.Md.
2001)("[Specific intent] signifies something more
than willing, voluntary, and knowing participation
in the illegal course of conduct . . . .  It means participating
in that course of conduct for the specific, shared purpose
of [monopolization].").

    Plaintiff alleges that Defendants conspired with the intent

27

that the Virtua Defendants monopolize the market for Emergency Procedures.  At the time Defendants allegedly entered into the conspiracy (Plaintiff alleges it began sometime in 2007), the Virtua Defendants had either no ability, or very limited ability, to perform any of the Emergency Procedures at issue. And any future ability to perform these procedures depended on Virtua obtaining a Certificate of Need from the state. Virtua also faced robust competition from at least Plaintiff, Cooper, and Lourdes.

Against this backdrop, Defendants argue that successful monopolization of the Emergency Procedures market is, and was, implausible and, with respect to the Penn Defendants and CGPA, there is no reason why they these entities would support a monopoly by Virtua.  Therefore, Defendants argue, it is implausible that they would have had the intent that the Virtua Defendants monopolize the relevant Emergency Procedures market. Plaintiff counters that there are plausible economic reasons why Defendants could have shared such intent.  Plaintiff misapprehends its burden.  It is not sufficient that there may be some plausible reasons that Defendants <u>could</u> have shared the requisite intent.  Plaintiff must instead advance factual allegations to render it plausible that Defendants <u>did</u> share the requisite intent.

Plaintiff has failed to meet this burden. On the

allegations before the Court in Plaintiff's Amended Complaint, successful monopolization of the Emergency Procedures market was implausible given the competitive landscape and that the Virtua Defendants were not even approved for such Procedures, let alone participants in the market.  In the face of these allegations, which are highly suggestive of a lack of specific intent, Plaintiff has failed to offer more than conclusory allegations of specific intent and argument why the Defendants rationally could have possessed such intent.  Plaintiff has not offered non-conclusory allegations suggesting that Defendants <u>did</u> have such intent.  Plaintiff has thus failed to plausibly allege that Defendants shared a specific intent for the Virtua Defendants to monopolize the Emergency Procedures market.  Therefore, Plaintiff has failed to plausibly allege a Section 2 claim.

IV.  <u>Conclusion</u>

    For all these reasons, Defendants' motions to dismiss Plaintiff's Section 1 claim is DENIED and Defendant's motion to dismiss Plaintiff's Section 2 claim is GRANTED.  Plaintiff's Section 2 Claim is dismissed without prejudice.


Dated: <u>December 30, 2011</u>   <u>s/Renée Marie Bumb</u>
                                 RENÉE MARIE BUMB
                                 United States District Judge