NOT FOR PUBLICATION                    [Docket Nos. 204 & 205]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

DEBORAH HEART AND LUNG CENTER,

        Plaintiff,

    v.

VIRTUA HEALTH INC., et al.,

        Defendants.

Civil No. 11-1290 (RMB/KMW)

**OPINION**

Appearances:

Anthony Argiropoulos
Scott B. Murray
Thomas Kane
Sills Cummis & Gross, P.C.
650 College Road East
Princeton, New Jersey 08540
    Attorneys for Plaintiff Deborah Heart and Lung Center

James J. Ferrelli
Philip H. Lebowitz
John E. Sindoni
Duane Morris LLP
1940 Route 70 East, Suite 200
Cherry Hill, New Jersey 08003
    Attorneys for Defendant Virtua Health, Inc. and Virtua
    Memorial Hospital Burlington County

Robert V. Dell'Osa
Cozen O'Connor P.C.
457 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002
    Attorneys for The Cardiology Group, P.A.

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court upon a two motions for summary judgment filed by the Defendants in this matter, Virtua Health, Inc. and Virtua Memorial Hospital Burlington County ("Virtua") and The Cardiology Group, P.A. ("CGPA"), (collectively referred to as the "Defendants"). Plaintiff Deborah Heart and Lung Center ("Plaintiff" or "Deborah") has opposed both motions. This Court heard oral argument on September 22, 2014, and ordered the parties to submit supplemental briefing on the issue of anticompetitive effects. After reviewing the parties' submissions, this Court will grant the Defendants' respective motions for summary judgment for the reasons set forth below.

I.   Background

   A. Relevant Facts

The record in this matter is voluminous and complex, and the facts, both undisputed and disputed, are well known to the parties. Therefore, this Court will set forth only those facts necessary for resolution of the instant motions. As is required on a motion for summary judgment, this Court will draw all inferences in favor of Plaintiff as the non-moving party. Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004)(stating that where

2

there are significant factual disputes between the parties, the facts should be construed in favor of the non-moving party).

For the reasons set forth below, resolution of the instant motions turns entirely on whether Plaintiff has presented sufficient evidence of anticompetitive effects. <u>See</u> discussion <u>infra</u> at 25-44. Therefore, the facts recited herein will focus on this issue, and the Court will provide a brief overview of other facts as they relate to the alleged conspiracy underlying this case.[1]

### i. The Relevant Business Entities

Plaintiff Deborah is a specialty hospital located in Browns Mills, New Jersey. [Virtua's Statement of Facts ("VSOF") and Plaintiff's Response ("PR") at ¶ 1].[2] Deborah is one of only three hospitals in the United States that is exempt from having to collect co-pays, deductibles, or any other out-of-pocket expenses from patients because the federal government recognizes

---

[1] Much of the Statement of Facts submitted by Plaintiff focuses on establishing a "conspiracy" between Virtua and CGPA, <u>see</u> <u>e.g.</u>, PSOF at ¶¶ 39-83, and between CGPA, Virtua and Penn, see PSOF at ¶¶ 87-113, to remove Deborah from the relevant market. The necessary facts surrounding the agreements are set forth herein only to the extent that the knowledge is necessary to understand the issue of anticompetitive effects, which is dispositive here.

[2] CGPA incorporated Virtua's response to the Plaintiff's Statement of Material Facts where relevant and Virtua incorporated CGPA's statement of material facts where relevant.

its special status as a charity hospital.  [PSOF at ¶ 2].  CGPA
was a cardiology practice that practiced in Burlington County at
the time relevant to this law suit. [Plaintiff's Statement of
Fact ("PSOF") and Virtua's Response ("VR") at ¶ 17].  In July
2012, Virtua purchased all of CGPA's assets but none of its
liabilities.  [Id.].  Virtua is a multi-hospital health system
in southern New Jersey, which includes Virtua Memorial Hospital
Burlington County.  [VSOF & PR at ¶ 3].  At the relevant time
period, under applicable regulations, Virtua was not authorized
to provide cardiac surgery.  [PSOF & VR at ¶ 27].  Penn
Presbyterian Medical Center ("PPMC") is a hospital in West
Philadelphia and is part of the University of Pennsylvania
Health System.  [PSOF & VR at ¶ 22].  PPMC is authorized to
perform cardiac surgery.

> ii. *ACI & PCI Procedures & Affiliation Agreements*

The term "ACI procedures," which are performed in
hospitals, refers to advanced cardiac interventional procedures
comprised of three types of services – angioplasties,
electrophysiology, and cardiac surgery.  [VSOF & PR at ¶ 6].
ACI procedures form two relevant product markets: emergency
angioplasty and non-emergency ACI procedures.  [VSOF and PR at ¶
6].  A "PCI" refers to a "Percutaneous Coronary Intervention"

and is a type of angioplasty.[3] <u>See</u> Expert Report of Evan Hoffman Schouten, Pl.'s Ex. 140 at 3.  In Pennsylvania and New Jersey, hospitals may only provide facilities for procedures under a license from the state's Department of Health.  [VSOF & PR at ¶ 8].  It is undisputed that during the relevant time period Deborah and PPMC were licensed to provide cardiac surgery services whereas Virtua was not. [PSOF & VR at ¶ 27].

When a patient requires an ACI procedure and the physician lacks the expertise to provide the ACI procedure or where the hospital where the patient is seen is not licensed to provide the service, a physician must refer the patient to a more specialized interventional cardiologist or to a hospital where the interventional cardiologist can perform the service.  [VSOR & PR at ¶¶ 7-10].  Prior to the transfer, patients must consent and the requirements of the New Jersey Patient's Bill of Rights must be fulfilled.  [VSOF & PR at ¶¶ 7-10].[4]

        *ii. Deborah & CGPA*

Because none of the CGPA cardiologists performed diagnostic invasive or interventional procedures before July 2006, patients

---

[3] For ease of reference, this Court will refer simply to ACI procedures throughout this Opinion as the term encompasses angioplasties and a PCI is a type of angioplasty.
[4] N.J.S.A. §26:2H-12.8.

in need of those procedures were referred to non-CGPA cardiologists who performed those types of specialty procedures, typically either to a Deborah-employed physician, or to physicians at Cooper University Hospital.  [VSOF & PR at ¶ 15].

In 1992, Deborah approached CGPA about sending more CGPA patients to Deborah, which led to a growing referral relationship between Deborah and CGPA.  [Id. at ¶ 16].  At this time, where a referral to a Deborah-employed physician was necessary for invasive diagnostic catheterization or ACI services and the CGPA patient was an inpatient or emergency patient at Virtua, the referral required the CGPA patient to be transferred from Virtua to Deborah for treatment by the Deborah-employed physician.  [Id. at ¶ 17].

By 1999, the referral relationship between CGPA and Deborah-employed physicians had grown, and CGPA entered into five identical individual contracts (the "Deborah Physician Leases") with certain interventional cardiologists employed by Deborah, including Charles A. Dennis, M.D.  [Id. at ¶ 18].  At the time CGPA entered into the Deborah Physician Leases, CGPA physicians primarily treated their patients at CGPA's own offices and at Virtua.  [Id. at ¶ 22].  Although treated by Deborah-employed physicians, those patients remained patients of

CGPA, and CGPA billed insurers and the patient for the services provided by the Deborah-employed physicians. [Id. at ¶ 21].

At the time of the 2002 Deborah Physician Leases between CGPA and Dr. Dennis, Dr. Dennis was the Chair of Deborah's Department of Cardiovascular Diseases, and had been employed at Deborah as an interventional cardiologist since 1991. [Id. at ¶ 25]. While still a Deborah employee in 2003, Dr. Dennis applied for and was granted medical staff privileges to perform low-risk catheterizations at Virtua, and Dr. Dennis became Virtua's first Cardiac Catheterization Laboratory Director, with Deborah's knowledge and consent. [Id. at ¶ 28].

On January 1, 2005, while the 2002 Deborah Physician Leases were in effect, CGPA entered into a Cardiology Services Agreement with Virtua (the "CSA") under which CGPA agreed to "provide all cardiac services to all patients in the Cardiovascular Department of the Hospital [Virtua]" on an exclusive basis . . . ." [Id. at ¶ 31]. The purpose of the CSA was "to promote control, cost, quality and efficiency of service in the performance of cardiac services" at Virtua, and its terms addressed CGPA's administrative and coverage obligations as the exclusive provider for cardiology services at Virtua. [Id. at ¶ 32]. In each year that the CSA was in effect, patients were transferred from Virtua to Deborah for procedures to be

performed at Deborah, as follows: 2005, 627 patients; 2006, 652 patients; 2007, 392 patients; 2008, 157 patients; 2009, 169 patients; and between January 1, 2010 and July 15, 2010, 60 patients. [Id. at ¶ 37]. In 2006, Virtua became licensed by the New Jersey Department of Health and Senior Services to operate as a full-service adult diagnostic cardiac catheterization facility; the facility became operational in 2007. [Id. at ¶ 38].

   *iv. Dr. Dennis and His Suspension*

   Dr. Dennis was employed by Deborah from 1991 to 2006; he announced his resignation on February 21, 2006, providing notice of his intention to resign from Deborah effective June 30, 2006, in order to join CGPA and become a CGPA employee. [Id. at ¶ 41]. With Dr. Dennis employed by CGPA, it became unnecessary for CGPA to continue to lease Deborah-employed physicians to treat their patients in need of interventional services, so the Deborah Physician Leases were terminated in July 2006. [Id. at ¶ 46]. From July 2006 through February 2007, Dr. Dennis continued to perform angioplasties at Deborah. [Id. at ¶ 47].

   Deborah alleges that as early as February 2006, Virtua executives were in contact with Dr. Dennis in an attempt to recruit him to help build Virtua's Cardiac Institute so that Virtua could obtain a cardiac surgery license. Deborah further

contends that Virtua was part of a conspiracy with CGPA to force Deborah into either a merger or complete shutdown.  [PSOF at ¶¶ 78-82].[5]

While the reasons precipitating his suspension are hotly disputed by the parties, it is undisputed that on February 20, 2007, Deborah suspended Dr. Dennis' privileges to perform interventional procedures at Deborah.  [PSOF at ¶ 62].  This suspension caused an immediate rift between Deborah and CGPA. On the very same day as the suspension, Diane Hinkel, CGPA's administrator, wrote to Deborah and explained that CGPA would not sign the terms of a new Deborah-CGPA arrangement (called the "Deborah-EP Physician Lease") due to Deborah's suspension of Dr. Dennis's privileges.  [VSOF & PR at ¶ 53].  Deborah attempted to persuade CGPA to sign the Deborah-EP Physician Lease, but CGPA declined.  [Id. at ¶ 54].  Dr. Fish, a CGPA physician at that time, expressed CGPA's view that Deborah's suspension of Dr. Dennis's privileges was a "totally unfair" and "unjustified" "black mark" on Dr. Dennis' record, and stating that CGPA's

---

[5] The factual record contains evidence in support of this point. See, e.g., Pl.'s Ex. 14 (October 2006 email from Dr. Dennis to Virtua Vice President, Matt Zuino, discussing a "white knight" strategy wherein Virtua could gain Deborah's cardiac surgery services); Pl.'s Ex. 31 (email from Dr. O'Neil to CGPA Executive Committee stating, "One of [Deborah's] accountants said he gives them 2 years before [its] doors close.  We could speed that up when we no longer do [percutaneous transluminal coronary angioplasties] at [Deborah].").

physicians were united that Dr. Dennis "must be immediately granted unconditional interventional privileges at Deborah" for the relationship to continue. [Id. at ¶ 55]. Dr. Dennis was understood by Deborah to be the "bridge between the CGPA and Deborah." [Id. at ¶ 63]. Contrary to CGPA's "demands," Deborah ultimately terminated Dr. Dennis' interventional privileges entirely. [Id. at ¶ 58].

*v. CGPA & PPMC*

Following the suspension of Dr. Dennis' privileges, CGPA physicians began to refer their patients who could not be treated by CGPA physicians to Penn Cardiology physicians. [VSOF & PR at ¶ 72]. Because Penn Cardiology physicians were employed by Penn, they routinely transferred patients to Penn hospitals, including, most frequently, PPMC. [Id.] In November 2007, CGPA and Penn Cardiology formalized their relationship via what is referred to as the "Penn Cardiology Physician Lease." [Id. at ¶ 75]. In January and February of 2008, CGPA also entered into an Occupancy Agreement, Affiliation Agreement and a Cardiology Working Group Participation Agreement with University of Pennsylvania Health System and/or its affiliates, (collectively referred to as the "Affiliation Agreement").[6] [Id. at ¶¶ 76-77].

---

[6] It is undisputed that Penn reached a settlement agreement with the United States to resolve alleged claims of violations of the Stark Act and Anti-Kickback Act as a result of its contractual

10

The Penn Cardiology Physician Lease provided for CGPA to
pay an annual leasing fee to Penn Cardiology, in return for
which Penn Cardiology leased interventional cardiologists to
CGPA on a part-time basis to treat CGPA patients in need of
diagnostic cardiac catheterization and interventional cardiac
procedures that CGPA physicians could not provide.  [Id. at ¶
78].

The Penn Cardiology Physician Lease also provided that
"[a]ll Services shall be performed at a hospital designated by
[CGPA]" and that the Penn Cardiology physicians would "take all
reasonable steps to ensure that any Physician providing Services
[under the agreement] shall obtain or maintain medical staff
privileges at the Hospital at which the Services are to be
performed."  [Id. at ¶ 80].  When procedures could not be
performed by Penn Cardiology physicians at Virtua, the Penn
Cardiology physicians provided those services at PPMC.  [Id. at
¶ 82].

Deborah contends that Penn wanted a commitment for a "100%
referral" of patients from CGPA.  [PSOF at ¶ 90]. Plaintiff
further avers, as is critical to its antitrust claims here, that
"although the Affiliation Agreement that was being negotiated
was ostensibly a contract between CGPA and Penn, there is no

_____

relationships with CGPA. [Pl.'s Ex. 65].

11

doubt that Virtua was an unnamed party to the agreement and directly participated in its negotiation." [PSOF at ¶ 93].[7] Plaintiff alleges that Penn and Virtua officials met during this time period and exchanged promises about what procedures would be sent from Virtua to PPMC. [Id. at ¶ 96]. Relatedly, Section 1.1. of the Affiliation Agreement provides, in relevant part, that "the Clinical Practices of the University of Pennsylvania. . . will be the exclusive provider of cardiac catheterization services to [CGPA's] patients." [PSOF at ¶ 100]. Again, the crux of Plaintiff's allegations is that there was a conspiracy to cut Deborah out of the market that involved Virtua, CGPA and Penn.

*vi. Geographic Markets & Alleged Anticompetitive Effects*

It is undisputed that the relevant markets for ACI procedures in this case, as are as follows:

- Non-emergency ACI procedures: Burlington, Camden, Mercer, Monmouth, and Ocean Counties, and parts of Philadelphia;
- Emergency PCI services: Burlington, Monmouth, and Ocean Counties.

[VSOF & PR at ¶ 96].

Following the inception of the alleged conspiracy, there was a powerful shift in transfers away from Deborah – i.e.,

---

[7] Plaintiff has pointed to record evidence in support of its point. See, e.g., Pl.'s Ex. 57 (email discussing "leakage" of patients from Virtua to Deborah).

"prior to 2007 the ratio of transfers from Virtua to either Deborah or Penn Presbyterian was roughly 85% Deborah to 15% Penn. After the suspension of Dr. Dennis's privileges, the ratio flipped, such that by January 2008 when the Penn Affiliation Agreement was signed the ratio was roughly 30% Deborah to 70% Penn." [PSOF at ¶ 256].

As a result of the alleged conspiracy, Plaintiff avers that "patients who were pipelined to Penn suffered higher out-of-pocket costs, lower quality and diminished choice." See Doc. 265, Pl.'s Supp. Br. at 1. As part of its conspiracy allegations, Plaintiff further states that Virtua and CGPA "had a policy of not informing patients of their option of transferring to Deborah instead of [PPMC]," and such failure to inform patients that they could be transferred to Deborah violates the New Jersey Patient's Bill of Rights. [See PSOF ¶¶ 138-148].[8] Moreover, Plaintiff contends that this failure to inform negatively impacted patient choice. For example, Plaintiff states that:

> there is abundant evidence that even when patients stated a preference to go to Deborah, they were bullied and lied to in order to block the transfer. More than twenty patients and/or family members have given sworn testimony in this case telling horrifying stories of rank mistreatment and

---

[8]  There is no private cause of action for violations of the New Jersey Patient Bill of Rights. See Castro v. NYT Television, 370 N.J. Super. 282, 291 (N.J. App. Div. 2004).

13

bullying at the hands of Virtua physicians, Virtua nurses, and CGPA physicians.

[PSOF at ¶ 149].  Plaintiff's Statement of Facts provides detail on the individual accounts of the twenty-plus patients cited and their experiences, which, Plaintiff contends, demonstrate that the doctrine of informed consent and the New Jersey Patients' Bill of Rights were violated.  [PSOF at ¶¶ 151-225.][9]

With respect to quality, Deborah and PPMC produced "door-to-balloon times," referring to the time lapse between a heart attack and the insertion of a catheter to the artery (a.k.a. "the balloon") to clear blockage.  [PSOF at ¶ 248].  Shorter door to balloon times are preferable as "minutes are crucial [and] time is muscle."  [Id. at ¶ 250].  Plaintiff alleges that the data demonstrates that Deborah beat PPMC's door-to-balloon times by, on average, eight minutes.  [Id.]  Thus, Plaintiff contends that one of the anticompetitive effects of the alleged conspiracy is that the patients experience inferior quality

---

[9] Plaintiff adds that it was unable to come forward with evidence of additional patients as state court discovery is not yet compete.  It further contends that "anticompetitive effects were felt by all 3,100 patients pipelined to Penn."  Doc. No. 265, Pl.'s Supp. Br. at 1, n. 2.  For purposes of this motion, this Court will draw the inference in favor of Plaintiff that many more patients were "pipelined" to Penn beyond the 20-plus cited in the Plaintiff's Statement of Fact.

because of PPMC's higher door-to-balloon times.  Pl.'s Supp. Br. at 1.

Finally, Plaintiff sets forth that "pipelined" patients "suffered higher out-of-pocket costs."  The only factual allegation in Plaintiff's Statement of Facts with respect to this point is "all patients treated at Deborah pay less out-of-pocket costs than patients treated at Penn——even when the patients have the same insurances and undergo the same medical procedures."  [PSOF at ¶ 23].

It is undisputed that Deborah's market share in the relevant markets as identified by Plaintiff was largely unchanged from 2006 to 2007: for ACI services, Deborah's 2007 market share was approximately 10 percent, based on data reported by Deborah and other hospitals to the State, and Deborah's 2007 market share for emergency PCI services was less than 9 percent.  [VSOF & PR at ¶ 106].  Plaintiff admitted that "[e]ven if Deborah were to be driven out of the market altogether, which did not occur, there would have been no significant reduction in competition in any relevant market." [Id. at ¶ 106].[10]

---

[10] At oral argument, Plaintiff clarified that it believed this statement to be a reference to market foreclosure, which is not at issue here.  Sept. 22, Tr. at 73-74.

B. *Procedural History*

Plaintiff's Complaint originally contained two claims: 1) that the Defendants conspired with one another in violation of Section 1 of the Sherman Act to exclude Plaintiff from the market for certain advanced cardiac interventional procedures, thereby restricting consumers' choice of providers for these procedures, and forcing consumers to pay higher prices; and 2) that these efforts were part of an overlapping conspiracy by the Defendants, in violation of Section 2 of the Sherman Act. During the pendency of this litigation, Plaintiff also has been simultaneously prosecuting a state court case again against the Defendants asserting common law claims for tortious interference and unfair competition. See Deborah Heart and Lung Center v. Virtua Health, Inc. et al., No. BUR-L-1487-09. That litigation is ongoing.

In a prior Opinion [Docket No. 56], this Court dismissed Plaintiff's Section 2 count for failure to state a claim, but permitted the Section 1 claim to proceed. In permitting that claim to proceed, this Court found that Plaintiff had sufficiently alleged anticompetitive effects within the relevant product and geographic markets. This Court also found that, because Plaintiff was alleging that it could demonstrate anticompetitive effects, it did not need to demonstrate market

16

foreclosure.  Docket No. 56 at 18-19.


  II.  <u>Standard of Review</u>

    Summary judgment shall be granted if "the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A fact is "material" if it will "affect the

outcome of the suit under the governing law . . . ." <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is

"genuine" if it could lead a "reasonable jury [to] return a

verdict for the nonmoving party."  <u>Id.</u>

    When deciding the existence of a genuine dispute of

material fact, a court's role is not to weigh the evidence; all

reasonable "inferences, doubts, and issues of credibility should

be resolved against the moving party."  <u>Meyer v. Riegel Prods.</u>

<u>Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere

"scintilla of evidence," without more, will not give rise to a

genuine dispute for trial.  <u>Anderson</u>, 477 U.S. at 252. Further,

a court does not have to adopt the version of facts asserted by

the nonmoving party if those facts are "utterly discredited by

the record [so] that no reasonable jury" could believe them.

<u>Scott v. Harris</u>, 550 U.S. 373, 380 (2007). In the face of such

evidence, summary judgment is still appropriate "where the

17

record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

III. <u>Analysis</u>

     As set forth above, the only remaining claim in this matter
is Plaintiff's claim pursuant to Section 1 of the Sherman Act,
which provides:

> Every contract, combination in the form of trust or
> otherwise, or conspiracy in restraint of trade or commerce
> among the several states or with foreign nations is hereby
> declared to be illegal.

15 U.S.C. § 1 (1994).  To establish a violation of Section 1, a
plaintiff must prove: "(1) concerted action by the defendants;
(2) that produced anti-competitive effects within the relevant
product and geographic markets; (3) that the concerted actions
were illegal; and (4) that it was injured as a proximate result
of the concerted action." <u>Gordon v. Lewistown Hosp.</u>, 423 F.3d
184, 207 (3d Cir. 2005); <u>Angelico v. Lehigh Valley Hosp.</u>, 184 F.
3d 268, 275 (3d Cir. 1999); <u>Black Box Corp. v. Avaya, Inc.</u>, No.
07-6161, 2008 WL 4117844, at *7 (D.N.J. Aug. 29, 2008).  For the
reasons set forth below, resolution of the instant motions turns
on the second prong of the test, and the Plaintiff's failure to
present sufficient evidence of anticompetitive effect warrants
summary judgment in favor of the Defendants.[11]

_____

[11] Because Plaintiff cannot demonstrate the requisite
anticompetitive effects, it is not necessary for this Court to
address the other prongs of the test.  <u>See</u> <u>Tunis Bros. Co., v.
Ford Motor Co.</u>, 952 F.2d 715, 722 (3d Cir. 1991)(declining to
address other prongs where plaintiff did not demonstrate

A. Quick Look v. Rule of Reason

As an initial matter, this Court must first resolve the appropriate analytical framework to apply to the purported evidence of anticompetitive effects – i.e., the "quick look" or traditional "rule of reason" analysis.  Plaintiff contends that it has set forth sufficient evidence to prove anticompetitive effects under either standard, but argues that this Court should apply the quick look standard.  Pl.'s Opp. Br. at 34.

The quick look analysis is an intermediate standard applied "where per se[12] condemnation is inappropriate, but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993) (internal quotations and citations omitted).  As stated by the Third Circuit, "the quick look approach may be applied only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." Gordon, 423 F. 3d at 210 (citing California Dental Ass'n v. FTC, 526 U.S. 756 (1999)).  In applying this standard, "competitive harm is

---

adequate anticompetitive effects).
[12] The per se rule applies to "plainly anticompetitive agreements or practices." United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993).  The Plaintiff does not contend that the per se rule applies here.

presumed and the defendant must set forth some justification for the restraints." Id.

In support of its argument that the quick look standard should be applied, Plaintiff contends that "[d]iscovery has yielded myriad facts which show that the conspiracy in which Virtua, CGPA and Penn engaged in is inherently suspect and has no legitimate competitive justification." Pl.'s Opp. Br. at 36. In response, the Defendants argue that there is no horizontal restraint present as the agreements at issue exist between Virtua and CGPA and Penn and CGPA, who are not market competitors. In addition, Defendants point to their expert's report, which found that 98% of the relevant markets were not impacted by the alleged restraint and that "such a de minimis restraint could have no impact on the market, either anticompetitive or procompetitive." Defs.' Reply Br. at 17.

Courts have applied the "quick look" analysis "in cases involving agreements not to compete in terms of price or output among members of professional associations," FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 459 (1986), or cases "where the plaintiff has shown that the defendant has engaged in practices similar to those subject to per se treatment." In re K-Dur Antitrust Litig., 686 F.3d 197, 209 (3d Cir. 2012). More recently, the Third Circuit has noted that in order to succeed

under either a per se or quick look approach, a plaintiff must show "the existence of a horizontal agreement, that is, an agreement between 'competitors at the same market level.'"  In re Insurance Brokerage Antitrust Litigation, 618 F. 3d 300, 318 (3d Cir 2010)(quoting In re Pharmacy Benefits Managers Antitrust Litig., 582 F.3d 432, 436 n.5 (3d Cir. 2009)).  Overall, as stated by the Supreme Court, the "quick look analysis carries the day when the great likelihood of anticompetitive effects can easily be ascertained."  Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).

Even if this Court views the alleged restraint as viewed by Plaintiff—i.e., a horizontal agreement between Virtua, CGPA and Penn—for the reasons set forth in more detail below, this Court is unable to find that the anticompetitive effects can be so easily ascertained as to militate in favor of the quick look analysis.  See Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d Cir. 1996)(declining to apply quick look analysis where plaintiff stated that the "restraint's negative effect on competition is manifest given the abundance of record evidence showing . . . decreasing output and increasing process . . . [,] because plaintiff "failed. . .  to substantiate its assertion with facts.").  Therefore, this Court finds it appropriate to apply the rule of reason analysis, "[t]he usual standard applied

to determine whether a challenged practice unreasonably restrains trade[.]"  In re Insurance Brokerage Antitrust Litigation, 618 F. 3d at 315.  In applying this standard, this Court is mindful that "[r]egardless of the standard used, the purpose of the inquiry is always to assess the effect of the conduct on competition[.]"  Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 831 (3d Cir. 2010).

Even if this Court were to begin with a quick look analysis as urged by the Plaintiff, a rule of reason analysis would, nevertheless, become applicable.  Where the quick look analysis is applied, "condemnation is proper only after assessing and rejecting the logic of proffered procompetitive justifications." Deutscher, 610 F. 3d at 832.  In applying the quick look standard, "[i]f, after examining the competing claims of anti- and procompetitive effects, it remains plausible that the net effect is procompetitive or that there is no effect on competition, then '[t]he obvious anticompetitive effect that triggers abbreviated analysis has not been shown.'"  Id. (emphasis added).

After reviewing the evidence propounded by the Defendants in support of their contention that the alleged restraint is neutral, i.e., "[has] no impact on the market either anticompetitive or procompetitive," Defs.' Reply Br. at 17, this

23

Court finds that it remains <u>plausible</u> that there is no effect on competition by the alleged restraint. <u>See</u> Declaration of Gregory Vistnes, Virtua App. at 285 ("Deborah's loss of CGPA's ACI services referrals did not reduce competition in any relevant market, but was instead a manifestation of ongoing competition."); Expert Report of Gregory Vistnes, Virtua App. at 440 ("there is no evidence of anticompetitive effects in any relevant antitrust market – either direct or indirect.").[13]   In finding that it remains plausible that there is no impact on competition, this Court must continue its analysis and apply the rule of reason, even if it were to begin with a quick look framework.   <u>Id.</u> at 833 (noting that rule of reason analysis applies once the quick look presumption disappears).

   B. <u>Rule of Reason Analysis</u>

   The rule of reason test "requires that a factfinder look at the totality of the circumstances in order to determine whether a business combination constitutes an unreasonable restraint of trade." <u>Gordon</u>, 423 F.3d at 210.   Moreover, under this standard, the plaintiff "bears the burden of showing that the

---

[13] <u>See</u> Pl.'s Ex. 112, Vistnes Deposition: 82:13-24 (noting, in response to various hypotheticals posed by Plaintiff's counsel that "the economic analysis that I've conducted remains fundamentally the same in all of the situations that you are hypothesizing about.  That economic analysis leads me to conclude that there was no harm to competition.").

alleged contract produced an adverse, anticompetitive effect within the relevant geographic market." Id.  As stated in this Court's prior Opinion, [Docket No. 56], a plaintiff may demonstrate that concerted action produced adverse, anticompetitive effects within the relevant product and geographic markets in two ways: (1) through direct evidence of actual anticompetitive effects; or (2) through proof of the defendant's market power, which acts as a proxy for anticompetitive effect.  Deutscher, 610 F.3d at 830.

While, in both cases, a plaintiff must make some showing of a relevant market, where a plaintiff demonstrates direct evidence of actual anticompetitive effects, the plaintiff's burden is diminished and it must only demonstrate "the rough contours of a relevant market."  In re Compensation of Managerial Professional and Technical Employees Antitrust Litig., No. 02-CV-2924, 2008 WL 3887619, at *7 (D.N.J. Aug. 20, 2008)(quotation omitted).  In this matter, Plaintiff has made clear that it is seeking to demonstrate direct evidence of actual anticompetitive effects.  As stated by several courts in this Circuit, however, "proof that the concerted action actually caused anticompetitive effects is often impossible to sustain. . . ."  Gordon, 423 F. 3d at 210 (citing Brown Univ., 5 F. 3d at 668).  As set forth above, the Defendants do not contest the

relevant markets as identified by Plaintiff's expert, Evan
Hoffman Schouten.  These markets include:

- Emergency Angioplasties: Burlington, Monmouth and
  Ocean Counties.
- Non-emergent/Elective ACI Procedures: Burlington,
  Camden, Mercer, Monmouth, and Ocean counties, as well
  as parts of Philadelphia.

[VSOR & PR at ¶ 96].  This Court will, therefore, utilize the
markets as defined by the Plaintiff for purposes of the
anticompetitive effects analysis, and refers to both sets of
procedures generally as "ACI Procedures."

Actual anticompetitive effects can be shown through reduced
output, increased prices, decreased quality, and loss of
consumer choice.  Tunis Bros. Co., Inc. v. Ford Motor Co., 952
F.2d 715, 728 (3d Cir. 1991)("An antitrust plaintiff must prove
that challenged conduct affected the prices, quantity or quality
of goods or services")(quotation and citation omitted).  Both
Defendants have moved for summary judgment arguing that
Plaintiff has failed to present evidence sufficient to create a
genuine dispute of material fact that the alleged concerted
action produced such anticompetitive effects within the relevant
product and/or geographic markets.[14]

---

[14] Virtua also moves for summary judgment arguing that Plaintiff
has failed to present sufficient direct or circumstantial
evidence of concerted action.  Because this Court finds that
there is no genuine dispute of fact with respect to

The Defendants advance the following arguments in support of their conclusion that Plaintiff has failed to provide direct evidence of actual anticompetitive effects in the relevant markets as a whole:[15]

- Plaintiff's expert offered no testimony demonstrating that prices have increased or that output or quality has decreased in the relevant market.  Doc. No. 204 at 3.
- There is no evidence that Deborah was prevented from competing in the relevant markets as evidenced by CGPA's small market share.  Doc. 205 at 23.
- Deborah has only demonstrated harm to itself as an individual competitor, which is insufficient to satisfy the required anticompetitive effects element.  Id. at 25.
- Even if certain patients paid higher co-pays or deductibles or were deprived of their choice to be transferred to Deborah, those individuals' experience do not establish the harm to competition in the relevant markets.  Id. at 29.

In its opposition papers, Plaintiff begins its argument by asserting what this Court determined at the motion to dismiss stage – i.e., that Plaintiff does not have to prove market power where it can present direct evidence of actual anticompetitive effects.  Pl.'s Opp. Br. at 40-45.  Again, this Court agrees that the demonstration of actual anticompetitive effects on the market as a whole obviates the need to demonstrate market power.

anticompetitive effects, it need not reach this argument.  Tunis Bros. Co., Inc., 952 F.2d at 722.

[15] See discussion infra at 27-41 regarding applicability of the "market as a whole" language.

[Docket No. 56 at 19, n.8].  After this Court's ruling on the
Motion to Dismiss, the parties engaged in extensive discovery
regarding Deborah's claim that it had evidence of actual
anticompetitive effects on the market as a whole.  Defendants
contend that discovery failed to reveal any competent evidence
of actual anticompetitive effects.  See e.g., Virtua's Br. at 22
(stating that Plaintiff's expert offers no opinions on "whether
or how CGPA's switch to Penn Cardiology injured competition in
the relevant markets she has defined[.]").

In their joint reply brief, the Defendants further argue
that Plaintiff's evidence is limited to only one hospital –
Deborah - and its loss of a portion of the referrals from the
twelve physicians practicing as CGPA, whose market share among
cardiologists in the relevant markets is less than 8%.  Defs.'
Reply, Doc. 232 at 1-2.  This evidence alone is insufficient as
a matter of law.  In addition, Defendants argue that "Deborah
has presented absolutely no evidence about the pricing, output
or quality of ACI procedures in the [m]arkets as a whole."  Id.
at 3.  Finally, Defendants contend that Plaintiff had not even
attempted to introduce evidence of market-wide harm and, instead
seeks to rely on claims that CGPA patients, who fail to
represent the remaining 92% of the relevant market, "did not
experience 'Deborah's superior patient satisfaction scores and

28

door-to-door balloon times,' and 'paid higher out-of-pocket costs.'" Defs.' Reply at 9 (quoting Pl's Opp. at 9).  In sum, it is the Defendants' view that, in addition to failing to show market power and/or market foreclosure, Plaintiff has not presented any evidence demonstrating that there have been price increases, output reductions, or quality diminishment in the relevant markets as a whole.  The Court agrees.

Initially, in reviewing the Plaintiff's opposition papers, this Court found that Plaintiff had failed to address the issue of actual anticompetitive effects, the very issue this Court found survived Defendants' motion to dismiss.[16]  This Court held a hearing on this issue on September 22, 2014.  At the hearing, it became apparent that the parties diverged on a central legal point that would need to be resolved by this Court: Plaintiff contends that it must only demonstrate "more than de minimis anti-competitive effects," Pl.'s Supp. Br., Doc. 25 at 1,

---

[16] It is not enough to survive summary judgment to simply state that this Court found, at the motion to dismiss stage, that Plaintiff had adequately pled direct evidence of anticompetitive effects.  Pleading and proof are distinct and summary judgment is the time Plaintiff is called on to put forth their evidentiary proof.  In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002)("a party will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial.").

whereas the Defendants assert that "any attempt by Deborah to demonstrate direct evidence of anticompetitive effects of a restraint must provide such evidence as to the <u>market as a whole</u>, not just an effect on Deborah or the patients of [CGPA]." Defs' Supp. Br., Doc. 264 at 1-2 (emphasis added).  Because resolution of this issue would ultimately impact this Court's decision, the Court directed the parties to submit supplemental briefs addressing this issue.

At oral argument and in their supplemental submission, the Defendants argued that the case law supports their conclusion that Plaintiff must demonstrate that the alleged agreement at issue injured competition in the markets "as a whole." Defendants contend that the evidence introduced by Plaintiff fails to show that there was any anticompetitive effect on the market as a whole.  For example, as stated in the declaration of Virtua's expert, Gregory Vistnes, harm to individual patient choice or having to incur a higher co-pay at another hospital "is not attributable to a reduction in competition in any relevant market."  Vistnes Decl., Virtua App. at 284.

In response to the Defendants' position that failure to demonstrate harm on the market as a whole is fatal, Plaintiff contends that "[t]he canard is that the anticompetitive effects have to be market wide.  That unto itself is erroneous.  There

30

is no support for that in the case law." Sept. 22, 2014, Oral
Arg. Tr. 56:22-24.  Plaintiff instead argues that its burden
with respect to presenting evidence of anticompetitive effects
is to simply demonstrate that the effects are "more than de
minimis."  Plaintiff argues that the support for this
proposition appears in Tunis Bros. Co. v. Ford Motor Co., 952
F.2d 715 (3d Cir. 1991), discussed further infra, wherein the
plaintiffs failed to demonstrate sufficient anticompetitive
effects, not because they failed to demonstrate an injury on a
market-wide basis, but because plaintiff had failed to
demonstrate more than a de minimis injury.  Sept. 22, 2014 Tr.
at 59: 10-12.  Plaintiff avers that, unlike the plaintiff in
Tunis, it can demonstrate more than a de miminis injury because
its patients who were "pipelined to Penn suffered higher-out-of-
pocket costs, lower quality and diminished choice."  Pl.'s Supp.
Br. at 1.  Importantly, Plaintiff does not point to any evidence
that it has presented to this Court demonstrating
anticompetitive effects as to the market as a whole.  Instead,
as set forth in its Statement of Facts, Plaintiff only presents
evidence that Deborah or some patients of the CGPA were impacted
as the relevant anticompetitive effects of the alleged
conspiracy.  See Doc. 265, Pl.'s Supp. Br. at 1.

This Court has reviewed the case law of this Circuit, other Circuits, and the cases cited by the parties, and it finds that, contrary to the Plaintiff's assertions at oral argument and in its submissions, the Third Circuit expressly requires a plaintiff to demonstrate that alleged anticompetitive effects impact the market at issue <u>as a whole</u>, as clearly set forth in <u>Eichorn v. AT&T Corp.</u>, 248 F. 3d 131 (3d Cir. 2001).  In <u>Eichorn</u>, the Circuit discusses this requirement in two sections of its opinion: 1) as discussed by Plaintiff at oral argument, during its discussion of antitrust standing, and, 2) most critically as it applies to the instant case, in its analysis of the alleged anticompetitive activity under the rule of reason standard.  In its standing discussion, the Court states:

> It is well established that an antitrust injury reflects an anti-competitive effect on the competitive market. . . . We have consistently held that an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market.

<u>Eichorn</u>, 248 F. 3d at 140.  Then, when discussing purported anticompetitive effects under the rule of reason analysis, the Court, again, notes "[t]he antitrust laws were not designed to protect every uncompetitive activity, but rather only those activities that have <u>anti-competitive effects on the market as a whole</u>."  <u>Id.</u> at 148 (emphasis added)(citing <u>Broad Music, Inc.</u>,

32

v. Columbia Broadcasting Sys., 441 U.S. 1, 23 (1979)("Not all
arrangements among actual or potential competitors that have an
impact on price are per se violations of the Sherman Act or even
unreasonable restraints.")).   Thus, it is clear that under Third
Circuit jurisprudence, anticompetitive effects must be shown *to
impact the market as a whole*.[17]   This is not, as Plaintiff urges,
merely a requirement that the Plaintiff demonstrates only more
than a de minimis market impact; that impact must extend to the
whole defined market.

     The Supreme Court's decision in Jefferson Parish v. Hyde,
466 U.S. 2 (1984) is instructive.   The Jefferson Parish case
involved an arrangement wherein East Jefferson hospital was
party to a contract providing that all anesthesiological
services required by the hospital's patients would be performed
by Roux & Associates, a single group of anesthesiologists.   Id.
at 5.   After finding that the agreement did not create a per se
violation of the Sherman Act, the Court engaged in "an inquiry
into the actual effect of the exclusive contract on competition
among anesthesiologists."   Id. at 29. Ultimately, the Court
found that there was no antitrust violation, stating "there has

---

[17] Notably, and tellingly, the Plaintiff fails entirely to
address the language of Eichorn in its supplemental briefing to
this Court on this very issue.

been no showing that the market as a whole has been affected at
all by the contract."  (Id. at 31)(emphasis added).

   While Plaintiff attempts to distinguish Jefferson Parish
because it is a case involving a "tying" arrangement, such
efforts are unsuccessful; the relevant portions on the analysis
in Jefferson Parish are not undermined by the fact that the
instant case does not involve tying.  Instead, the Court's
analysis of whether the contract between Roux and East Jefferson
hospital unreasonably restrained competition is directly
relevant here – i.e., the Court found "there is no evidence that
any patient who was sophisticated enough to know the difference
between two anesthesiologists was not also able to go to a
hospital that would provide him with the anesthesiologist of his
choice."  Id. at 30.  In so finding, the Court noted that there
was "no showing that the market as a whole has been affected at
all by the contract."  Id. at 31.  There is no indication that
the Court's analysis on this point is relevant in tying cases
only.  Instead, the statement follows the Court's discussion of
whether the arrangement at issue had an unreasonable impact on
purchasers with respect to price, quality or supply and/or
demand.  The same line of reasoning applies in the instant case,
and other courts engaging in a similar analysis have made the
same determination with respect to the required scope of

anticompetitive effects.  See, e.g., Capital Imaging Assoc., v. Mohawk Valley Med. Assoc., 996 F.2d 537, 543 (2d Cir. 1993)("Under [the rule of reason] test plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice. Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.")(emphasis in original)[18]; Med Alert Ambulance, Inc., v. Atlantic Health System, Inc., No. 04-1615, 2007 U.S. Dist. LEXIS 57083, at *29 (D.N.J. Aug. 6, 2007)("Under the rule of reason theory, the plaintiff must establish that the challenged action had an actual adverse

---

[18] Notably, Plaintiff cites to this case in its supplemental brief but fails to discuss the "to the whole market" language. In addition, Plaintiff contends that the Second Circuit does not require proof of a market-wide impact, citing Eiberger v. Sony Corp., 622 F.2d 1068 (2d Cir. 1980), a case that pre-dates not only Capital Imaging (by 13 years), but also the Supreme Court's decision in Jefferson Parish, 466 U.S. at 31-32 (finding no Section 1 violation where "there has been no showing that the market as a whole has been affected at all . . . .")(emphasis added).  In addition, the Second Circuit in K.M.B. Warehouse Distribs. v. Walker Mfg. Co., 61 F.3d 123, 127 (2d Cir. 1995) quotes Capital Imaging and its language with respect to demonstrating an adverse impact on the market "as a whole."

effect <u>on competition as a whole in the relevant</u>

<u>market.</u>")(emphasis added)(internal quotations omitted).

Other sources previously quoted by this Court refer to the need to demonstrate injury to the market as a whole. For example, Jonathan Jacobson, former member of the Congressional Antitrust Modernization Commission, persuasively writes: "In all cases, the relevant question is . . . whether there has been an adverse effect on price, output, quality, choice, or innovation in the <u>market as a whole</u>." Jonathan M. Jacobson, Exclusive Dealing, "Foreclosure," And Consumer Harm, 70 ANTITRUST L.J. 311, 362 (2002)(emphasis added).

In addition to the persuasive authority discussed above, this Court's decision is bolstered by other reasoning. For example, the need for Plaintiff's expert to define the rough contours of the market begs a critical question: Why does a plaintiff need to define a market if, ultimately, that plaintiff need not be concerned with the impact on that market overall? It is unclear how the undisputed need for a plaintiff to define the rough contours of the market fits into Plaintiff's espoused theory that its burden with respect to anticompetitive effects only requires a demonstration of more than de minimis effects, even if those effects only impact one competitor and a portion

of its customers.[19]   Under Plaintiff's theory, it appears that no market definition is even necessary.   The Court disagrees.

Moreover, language from cases cited to this Court by Plaintiff as authoritative further undermine the Plaintiff's position.   For example, in <u>Angelico v. Lehigh Valley Hospital, Inc.</u>, 184 F. 3d 268, 276 (3d. Cir. 1999), the Court notes that a plaintiff can prove actual anticompetitive effects via an "increase in price or deterioration in quality and goods and services."   <u>Id.</u>   The Court goes on to note "[d]ue to the difficulty of isolating the market effects of the challenged conduct, however, such proof is often impossible to make."   <u>Id.</u>; <u>see also</u>, <u>Orson, Inc. v. Miramax Film Corp.</u>, 79 F.3d 1358, 1367 (3d Cir. 1996)(same).   Again, if the burden were simply that a plaintiff must prove only a more than de minimis impact, a standard clearly more easily satisfied than the burden to show impact on the market as a whole, the case law would not refer to such proof as "often impossible to make."   Plaintiff provides no explanation.

---

[19] As aptly stated by counsel for Virtua at oral argument, "Deborah went to the trouble of getting an expert to posit the rough contours of the market but there is no mention whatsoever of that market in Deborah's brief in opposition to summary judgment."   Sept. 22, 2014 Hearing Tr. at 32:7-10.

In its supplemental brief and/or during oral argument,[20] the Plaintiff relied heavily on three cases: Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715 (3d Cir. 1991); Oltz v. Saint Peter's Community Hosp., 861 F.2d 1440 (9th Cir. 1988); and, Rome Ambulatory Surgical Ctr. v. Rome Mem. Hosp., 349 F. Supp. 2d 389 (N.D.N.Y. 2004).[21]  Plaintiff's central argument is that the Court in Tunis did not require harm to the market as a whole. Instead, the plaintiff's burden was only "to show more than a de minimis restraint."  Sept. 22, 2014 Tr. at 59:10-12.  While the Court in Tunis did note that "plaintiffs have a burden to show

---

[20] See Sept. 22, 2014 Tr. 50:15-18.
[21] Plaintiff's counsel, in discussing the applicability of cases like Rome, Oltz, Tunis, and KMB Warehouse to its situation stated:

> If you are saying that the injury to competition was that consumers were harmed because they lost access to you, you know, because for one reason or another you, the plaintiff, [is] not an option for consumers anymore, then you have to show that you gave consumers something that everybody else in the market isn't giving them.

Sept. 22, 2014 Oral Arg. Tr. 50:10-15. This Court fails to understand Plaintiff's appeal to these cases to the extent Plaintiff admitted that there was nothing special or different that Deborah offered.

> THE COURT: Are you saying that there is something special or different about Deborah that takes it out of the normal antitrust cases?

> MR. KANE: No, that's not what I'm saying, your Honor.

Sept. 22, 2014 Oral Arg. Tr. 49:18-22.

more than a de minimus restraint," the Plaintiff here cannot divorce this language from the language that follows in that same opinion: "The Sherman Act was designed to prohibit significant restraints of trade rather than to proscribe all unseemly business practices; and the plaintiffs must have demonstrated some harm to the competitive landscape from [defendant's] termination of the [plaintiff's] franchise." Tunis, 952 F.2d at 728 (internal quotations and citations omitted).  In addition, the very definitions of the relevant markets were at issue in Tunis, and the Court overturned the jury's finding as to the relevant product and geographic markets based on the evidence presented.  Id. at 725-727.  In the instant case, there is no dispute as to the relevant markets. Finally, the ultimate outcome of Tunis supports this Court's finding - i.e., a plaintiff's Sherman Act claim must fail where that plaintiff does not present evidence demonstrating that prices, quantity or quality for goods or services has been affected by the defendant's conduct.  Id. at 728.

Plaintiff's reliance on Oltz v. Saint Peter's Community Hosp., 861 F.2d 1440 (9th Cir. 1988), is similarly misplaced. As Plaintiff's counsel candidly acknowledged during oral argument, the contours of the market at issue in Oltz differed dramatically as the defendant in Oltz enjoyed a 84% market share

39

of general surgical services in Helena, Montana, one of the relevant markets for purposes of that court's analysis.  <u>Id.</u> at 1442.  Notably, the Court in <u>Oltz</u> distinguished <u>Jefferson Parish</u>, finding that, in that case, "[t]he defendant was only one hospital of several in a large metropolitan area[,]"  <u>Id.</u> at 1447, while the hospital in <u>Oltz</u> undisputedly dominated the relevant market.  Finally, the plaintiff in <u>Oltz</u> was able to demonstrate that "the price of anesthesia services and the incomes of the MD anesthesiologists rose dramatically because of the challenged restraint."  <u>Id.</u>  Again, Deborah has set forth no evidence here that the price of ACI services rose dramatically because of the alleged restraint in this case.

Finally, this Court finds <u>Rome Ambulatory Surgical Ctr. v. Rome Mem. Hosp.</u>, 349 F. Supp. 2d 389 (N.D.N.Y. 2004), distinguishable.  In <u>Rome</u>, the plaintiff, a freestanding ambulatory surgical facility, was forced to leave the market entirely as a result of the defendants' alleged conduct.  In addition, the plaintiff was able to demonstrate that commercial payers paid 35% lower rates during its tenure.  <u>Id.</u> at 409.  Again, in the instant case, Deborah continues to operate as a choice for patients in the relevant markets and it has demonstrated no increase in prices in the market as a whole in contrast to the facts in <u>Rome</u>.

With the need for demonstrating effects on the market as a whole in mind, this Court finds that summary judgment is appropriate.  Plaintiff has not offered any fact or expert evidence of anticompetitive effects on the market as a whole as defined by its own expert.  Instead, Plaintiff's evidence is limited to impacts it alone felt along with a subset of patients of CGPA who were sent to Virtua over Deborah.

Plaintiff offers no factual evidence regarding the specifics of the price increases other than to offer that patients who were treated at facilities other than Deborah would have higher out-of-pocket costs.  [PSOF at ¶ 23 ("all patients treated at Deborah pay less out-of-pocket costs than patients treated at Penn――even when the patients have the same insurances and undergo the same medical procedures.")].  Even assuming that Plaintiff is correct, there is no evidence in front of this Court demonstrating that costs for ACI procedures in the relevant markets rose on the whole as a result of the alleged conspiracy and a reduction in competition.  See e.g., Expert Report of Gregory Vistnes ("Vistnes Report"), Virtua App. at 480 ("I am aware of no such claims or evidence that prices are higher than what one would predict in an alternative scenario in which CGPA continued to refer most of its ACI patients to Deborah.").  Again, Plaintiff is only able to point out that

41

patients who were treated at facilities other than Deborah would have higher out of pocket costs than at other hospitals. Certainly, however, this was the case both before and after the institution of the alleged conspiracy due to Deborah's charity hospital status.

With respect to quality, Plaintiff's only factual support for its contention is that PPMC had higher door-to-balloon times than Deborah.  Again, this evidence only deals with CGPA patients who wanted to be sent to Deborah; there is no evidence presented by Plaintiff demonstrating that the quality of ACI procedures in the relevant markets as a whole was impacted by the agreements – i.e., that as a result of the alleged conspiracy, patients at other hospitals or of other practices experienced higher door-to-balloon times.  In short, Plaintiff has presented no evidence demonstrating that the quality of ACI procedures in the relevant markets as a whole was impacted by the alleged conspiracy.

Finally, with respect to patient choice, this Court will assume for purposes of this motion that many more patients than the 20-plus patients specifically cited in the Plaintiff's Statement of Facts were "pipelined" to PPMC from Virtua.  That said, the fact remains that this alleged restriction on choice involved less than 2% of the market for ACI procedures and there

42

is no evidence that patients who wanted to go to hospitals other than Deborah were impacted.  Again, this evidence alone is insufficient.  See Jefferson Parish, 466 U.S. at 30 (finding, where there was an exclusive contract between a hospital and one firm of anesthesiologists, that "there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice.").

In K.M.B. Warehouse Distribs. v. Walker Mfg. Co., 61 F. 3d 123, 128 (2d Cir. 1995), K.M.B., an auto parts distributor, contended that Walker, an auto parts manufacturer, and its distributors, violated Section 1 of the Sherman Act.  Walker, facing pressure from other distributors who were competitors of K.M.B., refused to supply its products to K.M.B.  The Court, in determining whether K.M.B. had demonstrated "an actual adverse effect on competition as a whole in the relevant market[,]" found that K.M.B. could not show that the impact on intrabrand competition was "anything but de minimis."  Id. at 128.  The Court went on to find that

> KMB's proof on this point consists almost entirely of
> affidavits from twelve of its current customers stating
> that they prefer both Walker products and KMB's superior
> service. Such isolated statements of preference are not a
> sufficient "empirical demonstration concerning the

[adverse] effect of the [defendants'] arrangement on price or quality," Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 30 n.49 . . . (1984), to state a § 1 claim. See id. at 30 (finding inadequate evidence of an actual adverse effect on competition even though "the evidence indicates that some surgeons and patients preferred respondent's [anesthesiology] services").

Id. The analysis employed in K.M.B. is instructive here with respect to whether Plaintiff has demonstrated anticompetitive effects. Again, this Court finds that reference to a subset of CGPA patients who preferred Deborah is insufficient.

III. Conclusion

"It is axiomatic that 'the antitrust laws . . . were enacted for the protection of competition, not competitors.'" Tunis Bros. Co., 952 F.2d at 727 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977)(emphasis in original)(internal quotations omitted). The Plaintiff has brought a claim for an antitrust violation and this Court must remain mindful of the underlying purposes of the antitrust laws, which "were not designed to protect every uncompetitive activity, but rather only those activities that have anti-competitive effects on the market as a whole." Eichorn, 248 F.3d at 148. Ultimately, Plaintiff has failed to demonstrate that the alleged agreements created an anticompetitive effect on the market as a whole. Instead, drawing all reasonable

44

inferences in favor of the Plaintiff, its evidence demonstrates that, at most, there has been harm to Plaintiff and a portion of its customers.  See K.M.B. Warehouse, 61 F.3d at 128 (finding no evidence of adverse effects where plaintiff "failed to come forward with any evidence that defendants' actions adversely affected service, quality or price market-wide.").  Indeed, Plaintiff has pursued a remedy for such harm in the pending parallel state court proceeding.

In sum, Plaintiff's detailed inventory of evidence related to an alleged conspiracy between Virtua, CGPA, and Penn does not create a genuine dispute of fact as to whether there has been a sufficient demonstration of anticompetitive effects.  This failure to show an impact of the alleged conspiracy on the market as a whole is fatal to Plaintiff's Section 1 claim under the Sherman Act.  See Eichorn, 248 F.3d at 148.  Thus, while Plaintiff may be able to pursue a remedy in state court, its remedy does not lie in federal court for an antitrust violation. For the reasons stated above, Defendants' respective motions for summary judgment are granted.  An appropriate Order will issue this date.

s/Renée Marie Bumb
RENEE MARIE BUMB
United States District Judge

Date: March 24, 2015